**Yoshiko SUZUKI, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 93–71C.**

United States Court of Federal Claims.

Oct. 22, 1993.

L. Joanne Sakai, San Francisco, CA, for plaintiff.

Ross D. Cooper, with whom were Asst. Atty. Gen. Frank W. Hunger, David M. Cohen, Director, and Sharon Y. Eubanks, Asst. Director, Wash., DC, for defendant.

## OPINION

ANDEWELT, Judge.

This is the first action filed in this court under the Civil Liberties Act of 1988, 50 U.S.C.App. § 1989b et seq. (the Act). Plaintiff, Yoshiko Suzuki, a United States citizen of Japanese ancestry, seeks $20,000 in compensation under the Act for damages she suffered as a result of her internment by the United States during World War II. The Department of Justice (the Department) declared plaintiff ineligible for payment under the Act. In the instant complaint, plaintiff seeks review of that decision. This action is presently before the court on cross-motions for summary judgment. For the reasons set forth below, plaintiff's motion for summary judgment is denied, and defendant's cross-motion is granted.

### I.

Congress adopted the Act in 1988 to address the United States' internment during World War II of individuals of Japanese ancestry. The circumstances that ultimately led to the Act essentially began on February 19, 1942, shortly after the United States declared war on Japan, when President Franklin D. Roosevelt issued Executive Order No. 9066, 7 Fed.Reg. 1407 (1942), to address potential espionage and sabotage by United States citizens and resident aliens of Japanese descent. The order permitted military commanders to designate "military areas" from which any persons could be excluded or in which any persons could be detained. *Korematsu v. United States*, 323 U.S. 214, 216–17, 65 S.Ct. 193, 194, 89 L.Ed. 194 (1944). On March 2, 1942, General J.L. DeWitt, Military Commander of the Western Defense Command, issued Public Proclamation No. 1, 7 Fed.Reg. 2320 (1942), which declared the entire Pacific Coast as "particularly subject to attack," and created the first "military areas" which would be regulated by subsequent proclamations. The military orders that followed eventually designated all of California, Washington, Oregon, Idaho, Montana, Nevada, Utah, and the southern portion of Arizona as "military areas," restricted the migration of individuals of Japanese ancestry located within these areas, and imposed criminal penalties for any violations of the restrictions established. *Id.* at 225–29, 65 S.Ct. at 198–99 (Roberts, J., dissenting). Thousands of individuals of Japanese ancestry, including plaintiff, were ordered to evacuate these military areas and were first moved to "assembly centers" and then detained in "relocation centers." *Id.* at 221, 65 S.Ct. at 196.

In 1980, Congress established the Commission on Wartime Relocation and Internment of Civilians (the Commission) to study the grievances of United States citizens of Japanese ancestry who had been interned during World War II. Pub.L. No. 96–317, 94 Stat. 964, § 2 (1980). The Commission issued its recommendations and in response, Congress adopted the Act. *See Personal Justice Denied: Report of the Commission on Wartime Relocation and Internment of Civilians* (1982). In describing the purpose behind the Act in Section 1989a, Congress makes poignant and indeed dramatic statements concerning the United States' internment policy during World War II. In Section 1989(1) and (2), Congress expressly acknowledges "the fundamental injustice of the evacuation, relo-

cation, and internment of United States citizens and permanent resident aliens of Japanese ancestry during World War II," and offers a formal apology to all those who had been interned "on behalf of [all of] the people of the United States."

In addition to acknowledging that an injustice had occurred and issuing an apology to *all* citizens and permanent resident aliens of Japanese ancestry who had been interned, Congress also established a program to provide financial restitution to *some* of these individuals. Section 1989b–4(a)(1) provides that "eligible individual[s]" are entitled to recover $20,000 in restitution for the deprivation of their liberty and property during internment. To qualify as "eligible," Section 1989b–7(2)(A) and (B) requires that an individual, *inter alia*, must have been (1) alive on the date of enactment of the Act, (2) a United States citizen or permanent resident alien during the evacuation, relocation, and internment period, and (3) confined, relocated, or otherwise deprived of liberty or property under the laws and orders in effect during that period. In addition, the definition of "eligible individual" expressly excludes "any individual who, during the period beginning on December 7, 1941, and ending on September 2, 1945, relocated to a country while the United States was at war with that country."

Under the Act, the Attorney General is responsible for identifying, locating, and paying eligible individuals. (Section 1989b–4(a) and (b).) Pursuant to 28 C.F.R. § 74.1–.17, the Attorney General, through the Office of Redress Administration, Civil Rights Division, Department of Justice (ORA), notifies individuals of their potential eligibility and verifies their claims upon receipt of certain background information. If the ORA determines that a person is ineligible, that person has the right to seek reconsideration of such a determination from the Assistant Attorney General for Civil Rights. A claimant may appeal any adverse decision by the Assistant Attorney General to the Court of Federal Claims.

## II.

The pertinent facts concerning plaintiff's internment and relocation are not in dispute. These facts demonstrate that plaintiff satisfies all of the statutory prerequisites for an "eligible individual" under the Act except one—plaintiff falls squarely within the exception to "eligible individual[s]" contained in Section 1989b–7(2)(B) because plaintiff relocated to Japan in 1943 "while the United States was at war with that country."

Plaintiff was born in Stockton, California, in 1919 and was registered as a dual citizen of the United States and Japan. As a child, plaintiff moved with her parents from California to Hiroshima, Japan. Shortly after their move, plaintiff's father returned to California, and in 1937, plaintiff joined her father. In February 1942, pursuant to Executive Order No. 9066, plaintiff and her father were moved to a detention center, and then later to a permanent internment camp.

In August 1943, plaintiff received a message from her mother through the International Red Cross that several members of plaintiff's family, including her mother, were ill. Plaintiff's mother requested that plaintiff, the eldest child, return to Japan to help care for her ailing family members. Because plaintiff could not otherwise communicate with her family and her family could not come to her in the United States, plaintiff felt it her duty to return to Japan. The director of the internment camp advised plaintiff that if she wished, plaintiff could return to Japan aboard an exchange ship that was scheduled to leave from New Jersey within the next few weeks. Plaintiff agreed and in September 1943 returned to Japan. Plaintiff lived and worked in Hiroshima and Tokyo until 1957 when, some years following her marriage, she returned to the United States.

In 1990, plaintiff filed her application with the ORA seeking $20,000 in compensation under the Act. The ORA denied plaintiff's application on the ground that plaintiff had relocated to Japan during the war and therefore fell within the exclusion set forth in the statutory definition of "eligible

individual." The Assistant Attorney General for Civil Rights affirmed the ORA's decision in a final agency action dated October 23, 1991. Thereafter, plaintiff sought to appeal the Assistant Attorney General's decision to the Court of Appeals for the District of Columbia Circuit, but the court of appeals determined that it lacked jurisdiction over plaintiff's claim. Plaintiff filed the instant action on February 8, 1993.

### III.

Section 1989b–4(h) of the Act provides that this court shall review the Assistant Attorney General's denial of compensation "upon the administrative record" and shall set the denial aside as unlawful "if [the denial] is found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."

Plaintiff herein does not (and reasonably cannot) dispute that the Assistant Attorney General interpreted and applied the Act in a manner consistent with the statute's literal requirements, *i.e.*, that plaintiff does not qualify as an "eligible individual" under the Act because plaintiff's relocation to Japan in 1943 placed her within the literal scope of the exception to "eligible individual[s]" contained in Section 1989b–7(2)(B). Rather than attacking the Department's interpretation or application of the exception, plaintiff attacks the exception itself. Plaintiff contends that it was unconstitutional for Congress to carve out the exception that it did when it granted compensation to World War II internees. Because the exception in Section 1989b–7(2)(B) is unconstitutional, plaintiff argues, the Department's decision enforcing the exception is "not in accordance with law" and, hence, should be set aside by this court.

Plaintiff's constitutional argument, in effect, has two related prongs. First, plaintiff contends that excluding individuals who relocated to countries with which the United States was at war violates those individuals' Fifth Amendment liberty right to travel to foreign countries. Second, plaintiff contends that even assuming there was no violation of these individuals' liberty interest in international travel, the statu-

tory exclusion would still violate the excluded individuals' Fifth Amendment due process rights. In this regard, plaintiff argues that Congress intended to deny benefits to individuals who were disloyal to the United States but implemented that intent by creating an irrebuttable and factually insupportable presumption, violative of due process, that all persons who so relocated were disloyal to the United States. For the reasons set forth respectively in Sections IV and V below, both prongs of plaintiff's constitutional argument fail.

### IV.

Plaintiff contends that because the exception applies only to those individuals who travelled to countries outside the United States, the exception violates an individual's constitutional right to travel internationally. Plaintiff is correct that an individual's freedom to travel internationally is a liberty interest protected by the due process clause of the Fifth Amendment. *Califano v. Aznavorian*, 439 U.S. 170, 176, 99 S.Ct. 471, 474, 58 L.Ed.2d 435 (1978). Plaintiff is incorrect, however, that the exception contained in Section 1989b–7(2)(B) violates the Fifth Amendment's protection of that liberty interest.

The Supreme Court discussed the liberty interest involved in international travel at length in *Aznavorian*. Therein, as in the instant case, the Court examined the constitutionality of a statute that granted benefits to individuals who satisfied certain criteria, but excepted those individuals who had spent a specified period of time outside the United States. The statute under scrutiny in *Aznavorian* provided social security benefits under the Supplemental Security Income program for the needy aged, blind, and disabled. The statute excluded individuals from receiving such benefits for any month the individuals spent entirely outside the United States. 42 U.S.C. § 1382(f) (1972). In attacking the constitutionality of this statutory restriction, the plaintiffs therein relied upon essentially the same precedent involving international travel as plaintiff herein. *See, e.g., Aptheker v. Secretary of State*, 378 U.S. 500, 84 S.Ct. 1659,

12 L.Ed.2d 992 (1964), and *Kent v. Dulles,* 357 U.S. 116, 78 S.Ct. 1113, 2 L.Ed.2d 1204 (1958). The Court rejected this attack and concluded that the statutory exception restricting benefits for those who travelled outside the United States had only an incidental, and not a direct, impact on the freedom to travel internationally, and where a statutory exception restricting such benefits has only an incidental impact on international travel, the exception violates due process guarantees only if it is "wholly irrational." The Court explained:

> Unlike cases involving the [virtually unqualified] right of interstate travel, this case involves legislation providing governmental payments of monetary benefits that has an incidental effect on a protected liberty....

> The statutory provision in issue here does not have nearly so direct an impact on the freedom to travel internationally as occurred in the [*Kent v. Dulles,* 357 U.S. 116, 78 S.Ct. 1113, 2 L.Ed.2d 1204 (1958), *Aptheker v. Secretary of State,* 378 U.S. 500, 84 S.Ct. 1659, 12 L.Ed.2d 992 (1964), *Zemel v. Rusk,* 381 U.S. 1, 85 S.Ct. 1271, 14 L.Ed.2d 179 (1965)]. It does not limit the availability or validity of passports. It does not limit the right to travel on grounds that may be in tension with the First Amendment. It merely withdraws a governmental benefit during and shortly after an extended absence from this country. Unless the limitation imposed by Congress is wholly irrational, it is constitutional in spite of its incidental effect on international travel.

439 U.S. at 177, 99 S.Ct. at 475.

The instant statute, like that in *Aznavorian,* merely withholds a governmental benefit and does not proscribe or otherwise place legal impediments on an individual's freedom to travel internationally. Moreover, the exception herein has an even more remote impact on an individual's freedom to travel internationally than the exception analyzed in *Aznavorian.* The *Aznavorian* exception created an economic disincentive to travel abroad and thereby, from an economic perspective, could be ar-

gued to restrict the individual's freedom to travel abroad. The instant exception, however, involves no analogous economic restriction. The instant exception could not have impeded plaintiff's incentive or ability to travel internationally in 1943 because the Act, containing the exception, was not in effect at that time. Next, the exception could not discourage or impede any international travel after its 1988 enactment because the Act covers only travel during 1941–45. Finally, the exception did not interfere with any financial expectation that plaintiff reasonably could have had when she relocated to Japan in 1943 because Congress' decision to grant $20,000 to those internees who remained in the United States could not have been foreseen by plaintiff at the time. Indeed, rather than the United States having interfered with plaintiff's freedom to travel to Japan in 1943, in a sense, the United States can be said to have facilitated plaintiff's travel. As stated above, the United States provided the transportation for plaintiff to return to Japan at her request.

Because the instant exception directly affects only the receipt of government benefits and had at most an incidental impact on plaintiff's freedom to travel internationally, the analysis of *Aznavorian* controls. Thus, the instant exception is not an unconstitutional infringement on the liberty interest involved in international travel unless the exception is "wholly irrational." Plaintiff seems to argue that the exception was not a rational way for Congress to address the problems it sought to address in the Act, but plaintiff presents that argument in the context of the second prong of her constitutional argument. In this context, the court will address the rationality of the exception in Section V, *infra.*

## V.

### A.

Plaintiff's alternative constitutional argument also rests on the due process clause of the Fifth Amendment. Plaintiff interprets the exception contained in Section 1989b–7(2)(B) as an effort by Congress

to deny compensation to individuals who had been disloyal to the United States. Plaintiff then attacks Section 1989b–7(2)(B) as violating due process because the exception therein is based upon an irrebuttable and factually insupportable presumption that all persons who relocated to countries with which the United States was at war were disloyal to the United States. Plaintiff contends that even assuming Congress properly could deny benefits to internees who had been disloyal, the due process clause of the Fifth Amendment demands that Congress employ a more narrow, more tailored approach that would distinguish more effectively between those internees who had been disloyal and those, like plaintiff, who had not.

To determine the proper standard to apply when evaluating plaintiff's due process claim, it is necessary to appreciate the essential nature of plaintiff's claim for compensation. In 1988, when Congress adopted the Act to address the injustice that had occurred four decades earlier, plaintiff and other World War II internees apparently did not have any legally enforceable claims surviving against the United States for deprivation of liberty and property during internment. Therefore, when Congress enacted the Act, it responded to a moral, not a legal, obligation. In Section 1989b–7(2)(A) and (B), Congress unambiguously defined the class of World War II internees to whom it felt morally obliged to extend benefits, and specifically excluded those individuals, like plaintiff, who had relocated to countries with which the United States was at war. Plaintiff's dispute with Congress, therefore, focuses on Congress withholding from certain individuals benefits that it felt morally obliged to give to another group of individuals to whom it owed no legal obligation.

In *Weinberger v. Salfi*, 422 U.S. 749, 773, 95 S.Ct. 2457, 2470, 45 L.Ed.2d 522 (1975), the Supreme Court addressed a somewhat analogous issue concerning Congress' authority under the Fifth Amendment to grant certain benefits to one class of individuals, while denying the same benefits to another class of individuals. The statute in issue in *Salfi*, 42 U.S.C. § 402(g), granted federal survivor insurance benefits to widows of "insured wage earners." The statute, however, excluded from the definition of "widow" any person who had not been married more than nine months at the time of his or her spouse's death. This nine-month period was enacted to address the concern that individuals may abuse the benefits program by entering marriages for the sole purpose of securing survivor benefits. *Id.* at 778–80, 95 S.Ct. at 2473–74.

Ms. Salfi had been married for less than six months at the time of her husband's death and, hence, did not qualify for survivor benefits under the statutory definition of "widow." Ms. Salfi brought suit to challenge Congress' power to define the term "widow" as it did. Ms. Salfi based her challenge on the Fifth Amendment and in so doing, made strikingly similar arguments to those plaintiff makes herein. Ms. Salfi alleged that the definition of "widow" was unconstitutional because, in effect, Congress had created an irrefutable and factually insupportable presumption that all marriages that ended within the first nine months by death were entered for the purpose of securing social security benefits. Instead, Ms. Salfi argued, Congress should have drawn a less inclusive prohibition to address more efficiently the abuse problem.

The *Salfi* Court acknowledged that the statutory definition of "widow" barred Ms. Salfi from receiving any benefits even though her marriage may not have been an effort to abuse the social security system. But the Court nevertheless found the definition of "widow" fully consistent with the due process requirements of the Fifth Amendment. The Court articulated the proper standard for evaluating the constitutionality of such a denial of benefits, as follows:

The standard for testing the validity of Congress' Social Security classification was clearly stated in *Flemming v. Nestor*, 363 U.S. [603,] 611 [80 S.Ct. 1367, 1373, 4 L.Ed.2d 1435 (1960)]:

"Particularly when we deal with a withholding of a noncontractual benefit under a social welfare program such as [Social Security], we must recognize that the Due Process Clause can be thought to interpose a bar only if the statute manifests a patently arbitrary classification, utterly lacking in rational justification."

*Salfi,* 422 U.S. at 768, 95 S.Ct. at 2468.

The Court explained, in effect, that such a classification would "utterly lack[ ] in rational justification," if "Congress ... invidiously discriminate[d] among such claimants on the basis of a 'bare congressional desire to harm a politically unpopular group,' *U.S. Dept. of Agriculture v. Moreno,* 413 U.S. 528, 534 [93 S.Ct. 2821, 2826, 37 L.Ed.2d 782] (1973), or on the basis of criteria which bear no rational relation to a legitimate legislative goal. *Jimenez v. Weinberger,* 417 U.S. 628, 636 [94 S.Ct. 2496, 2501, 41 L.Ed.2d 363] (1974); *U.S. Dept. of Agriculture v. Murry,* 413 U.S. 508, 513–14 [93 S.Ct. 2832, 2835, 37 L.Ed.2d 767] (1973)." 422 U.S. at 772, 95 S.Ct. at 2470. The Court rejected the argument that the due process test turns on whether Congress theoretically could have drafted a more narrow exclusion to address a particular problem or concern. The Court explained:

[T]he question raised is not whether a statutory provision precisely filters out those, and only those, who are in the factual position which generated the congressional concern reflected in the statute. Such a rule would ban all prophylactic provisions, and would be directly contrary to our holding in *Mourning [v. Family Publications Service, Inc.,* 411 U.S. 356, 93 S.Ct. 1652, 36 L.Ed.2d 318 (1973) ]. Nor is the question whether the provision filters out a substantial part of the class which caused congressional concern, or whether it filters out more members of the class than nonmembers. The question is whether Congress, its concern having been reasonably aroused by the possibility of an abuse which it legitimately desired to avoid, could rationally have concluded both that a particular limitation or qualification would protect against its occurrence, and that the expense and other difficulties of individual determinations justified the inherent imprecision of a prophylactic rule.

422 U.S. at 777, 95 S.Ct. at 2472–73.

Although the instant legislation differs from the social welfare legislation involved in *Salfi* in that it dispenses funds from the public treasury based on a perceived moral obligation rather than on general social welfare grounds, this distinction would hardly warrant placing greater restrictions than allowed in *Salfi* on Congress' discretion. As described above, Congress adopted the Act as an act of conscience, and the Fifth Amendment would seem to allow Congress at least equivalent discretion in determining who, in good conscience, should receive certain benefits as it allows Congress in determining who should be eligible for benefits in typical social welfare legislation.

Applying the *Salfi* standard, plaintiff has not presented any significant evidence suggesting that the exception in Section 1989b–7(2)(B) was the product of a "bare congressional desire to harm a politically unpopular group." Therefore, under *Salfi,* the exception can withstand Fifth Amendment scrutiny so long as it bears a "rational relation to a legitimate legislative goal."

B.

The legislative history cited by the parties does not explain the precise legislative goal Congress sought to achieve in drafting the exception contained in Section 1989b–7(2)(B). The exception was not included in the original versions of the Act introduced in the House and Senate. The version ultimately passed in the House did contain the exception, but the only explanation for the change in the relevant House Committee Report is the statement that "restitution ... will not be available to any individual who relocated to an enemy country during World War II." H.R.Rep. No. 278, 100th Cong., 1st Sess. at 11 (1987). The Senate ultimately agreed to the exception as adopted by the House, but the relevant Conference Report does not explain

the Senate's rationale for changing its position.

Plaintiff contends that Congress' goal in enacting the exception was to punish disloyal internees. To support this interpretation, plaintiff cites an April 25, 1986, letter from the Department to Congress in which the Department objects to the definition of "eligible individual" in the original bill because the definition extended benefits to certain allegedly fanatical internees who were loyal to Japan and had sought repatriation to Japan after the end of the war. The letter states:

> The all-inclusiveness of the term "eligible individual" overlooks the important factor that at least several hundred of the detainees were fanatical pro-Japanese, had terrorized their fellow detainees loyal to the United States, and voluntarily sought repatriation to Japan *after the end of the war. See, Acheson v. Murakami,* 176 F.2d 953, 958 (9th Cir.1949); *McGrath v. Abo,* 186 F.2d 766, 771–72 (9th Cir.), *cert. denied,* 342 U.S. 832 [72 S.Ct. 38, 96 L.Ed. 629] (1951).... It would be unfair to the United States and to the loyal persons of Japanese descent if the benefits of this legislation were available to persons who were disloyal to the United States.

(Emphasis added.)

But contrary to plaintiff's contention, the exception contained in Section 1989b–7(2)(B) hardly seems to represent an effort to address the points made in the Department's letter. First, although the Department's position had originally been presented in the 1986 letter to Congress, the bills as subsequently introduced in Congress did not contain the exception. H.Rep. 442, 100th Congress, 1st Sess. (1987); S. 1009, 100th Cong., 1st Sess. (1987). Second, Congress received numerous comments criticizing the Department for proposing such a loyalty test and Congress never specified that it did not concur in that criticism. Third, and most importantly, the exception does not exclude from compensation the very individuals who the Department contended should be excluded. The Act, in pertinent part, excludes only internees who relocated during the war and thereby does not exclude those internees who, according to the Department, had "terrorized their fellow detainees loyal to the United States, and voluntarily sought repatriation to Japan *after the end of the war*" (emphasis added).

### C.

Without a specific indication from Congress as to the legislative goals that underlie the exception contained in Section 1989b–7(2)(B), the court will have to assess Congress' possible goals from the wording of the exception and the context in which it was written. It would seem that Congress likely denied benefits to the excepted group of internees in order to achieve either or both of two goals. First, Congress may, in fact, have intended to deny benefits to certain internees who had been disloyal to the United States, albeit different internees than were the subject of the Department's letter. Congress may have concluded that, at least for some internees, the act of relocating to a nation with which the United States was at war was disloyal because it was tantamount to "choosing sides." Second, Congress instead may simply have intended to deny benefits to internees who, despite possible continued loyalty to the United States, had aided an enemy country during war. Congress could have concluded that an internee's presence in an enemy country during wartime would aid that country, for example, by supporting the economy and/or by being available for propaganda purposes.

It certainly is debatable whether Congress chose the best policy in creating the exception it did. But it would seem beyond dispute that in creating the exception, Congress pursued a legitimate legislative goal when it sought to deny benefits to individuals who had been disloyal to the United States or who had put themselves in a position to aid an enemy country during wartime. It also seems beyond dispute that the exception as drafted bears a "rational relation" to achieving those goals. In this regard, it seems rational for Congress to have presumed that at least some of the internees who had relocated to Japan during the war were loyal to Japan rather than to the United States, and that the

relocation of internees to Japan may have aided the Japanese war effort in some way. Therefore, in excluding from benefits those individuals who had relocated to Japan during the war, Congress was denying benefits to at least some internees who had been disloyal and who had aided an enemy country.

Certainly, Congress could have included in the Act a less-inclusive exception that would have limited the denial of benefits to those individuals who in fact had been disloyal or had aided the Japanese war effort. But as *Salfi* explains, overinclusiveness in and of itself does not render a classification violative of the Fifth Amendment. Moreover, as *Salfi* also explains, Congress realistically must consider the administrative costs involved in enforcing the lines that it draws in legislation distinguishing those who are entitled to benefits and those who are not. 422 U.S. at 784, 95 S.Ct. at 2476. Here, Congress drew a line that requires simply a determination of whether an internee relocated during World War II to a country with which the United States was at war. This line would seem relatively inexpensive to enforce. On the other hand, given the passage of over 40 years since the internment, even if it were possible to determine which individuals had been disloyal and which had aided an enemy country, a case-by-case determination certainly would involve far higher costs. Here, as in *Salfi*, it was not unreasonable for Congress to conclude, in effect, that "the expense and other difficulties of individual determinations justified the inherent imprecision of a prophylactic rule." *Id.* at 777, 95 S.Ct. at 2473. Therefore, because the exception "rational[ly] relate[s] to a legitimate legislative goal," the exception does not violate the due process protection of the Fifth Amendment and the Department's decision to deny plaintiff compensation must be affirmed.

## VI.

A few final observations seem warranted with respect to Congress' decision to deny compensation to plaintiff. First, as should be apparent from the preceding discussion, Congress' denial of compensation to plaintiff does not suggest in any way that Congress concluded that plaintiff personally was disloyal to the United States or that plaintiff personally aided Japan's war effort in any significant way. In enacting the Act, Congress no doubt recognized that the exception, like virtually all legislative lines separating beneficiaries from nonbeneficiaries, did not do perfect equity. Plaintiff should recognize that she has been denied compensation simply because she stands on the wrong side of the line that Congress sought, in good conscience, to draw.[1]

Second, it seems important also to recognize that while Congress did not authorize any financial payment to plaintiff, it did not ignore plaintiff's plight. The Act is far more than a compensation act. It is an act of conscience, an act of apology. While the Act denied plaintiff compensation, it offered her something else, which to some would seem far more significant than a symbolic cash payment. By its terms, the act spoke directly to plaintiff. It boldly acknowledged the injustices that she suffered and sincerely extended to her, on behalf of all of the people of the United States, an apology for her losses. It is a rare instance when a nation voluntarily issues such an apology for the excesses that it inflicted on the innocent during the time of war.

### Conclusion

For the reasons set forth above, plaintiff's motion for summary judgment is denied and defendant's cross-motion is granted. Accordingly, the Clerk of the Court shall enter judgment dismissing plaintiff's complaint. No costs.

IT IS SO ORDERED.

---

1. Indeed, plaintiff's perception that she was inequitably excluded from receiving benefits seems especially understandable on the present record, which indicates that plaintiff returned to Japan for noble reasons rather than out of disloyalty to the United States, and which does not contain any evidence indicating that plaintiff aided Japan's war effort in any significant way.