**Douglas L. ISHIDA, Plaintiff,**

**v.**

**The UNITED STATES, Defendant.**

**No. 93–343C.**

United States Court of Federal Claims.

April 22, 1994.

---

Richard Halberstein, Washington, DC, atty. of record, for plaintiff.

Ross D. Cooper, Washington, DC, with whom was Asst. Atty. Gen., Frank W. Hunger (David M. Cohen, Director, and Sharon Y. Eubanks, Asst. Director, of counsel), for defendant.

## OPINION

FUTEY, Judge.

This case involves the Civil Liberties Act of 1988 (Act), 50 U.S.C.App. § 1989, *et seq.* (1993). Plaintiff seeks to recover $20,000.00 pursuant to the Act, which provides payment to individuals of Japanese ancestry who were deprived of liberty or property resulting from actions taken by the United States government during World War II. The Department of Justice (DOJ), which is the Agency charged with administering the funds, determined that plaintiff was ineligible for compensation under the Act. Plaintiff seeks a reversal of DOJ's denial of redress pursuant to its regulations, and a finding that DOJ's interpretation under the regulations is unconstitutional. Defendant contends that it justly denied plaintiff's application for compensation and avers that the regulations are constitutional. The instant action is before

the court on cross-motions for summary judgment.

### Facts

On February 19, 1942, President Franklin D. Roosevelt issued an Executive Order authorizing the Secretary of War, and the military commanders to whom he delegated authority, the power to exclude "any and all persons" from designated areas in order to provide security against espionage and sabotage. *See,* Exec. Order No. 9066, 7 Fed.Reg. 1407 (1942); *Korematsu v. United States,* 323 U.S. 214, 65 S.Ct. 193, 89 L.Ed. 194 (1944). Although the Order never made specific reference, it was primarily directed towards United States citizens or resident aliens of Japanese descent. Ultimately, by Public Proclamation, the entire Pacific Coast was declared particularly susceptible to espionage and sabotage, resulting in the exclusion of all persons of Japanese descent from the area. At first, the United States government initiated a "voluntary" relocation program from the "military areas" on the West Coast; those who left their homes were free to relocate to other areas of the United States. Later, a mandatory relocation program was instituted and all Japanese–Americans in the military zones were required to report to designated holding areas and were ultimately sent to internment camps. This also included an estimated 5,000 individuals who were arrested and taken from their homes in Hawaii, and over 1,000 individuals who were sent to camps on the Mainland. Although a majority of the Japanese–Americans residing in Hawaii were not placed in camps, they were forced to live in "government provided quarters." Even Japanese–American veterans, who had honorably served their country, were summarily discharged from military service, and prohibited from returning to their homes.

Prior to the current statute, Congress, in 1948, enacted the Japanese–American Evacuation Claims Act. A 1956 amendment to that Act gave jurisdiction to the Court of Claims, "to entertain suits by those of the dispossessed who had been unable to obtain acceptable relief through the claims procedures administered by the Attorney General." *Taki Sonoda v. United States,* 154 Ct.Cl. 130, 133, 1961 WL 8731 (1961).[1] The Japanese–

1. The Japanese–American Evacuation Claims Act of 1948, as amended, 50 U.S.C.App. §§ 1981–87 (1993 ed.) reads as follows:

§ 1981

\* \* \* \* \* \*

(a) The Attorney General shall have jurisdiction to compromise and settle and make an award in an amount not to exceed $100,000, as hereinafter provided on any claim by a person of Japanese ancestry against the United States arising on or after December 7, 1941, when such claim is not compensated for by insurance or otherwise, for damage to or loss of real or personal property (including without limitation as to amount damage to or loss of personal property bailed to or in the custody of the Government or any agent thereof), that is ... a reasonable consequence of such person by the appropriate military commander from a military area in Arizona, California, Oregon, or Washington....

\* \* \* \* \* \*

§ 1984

(a) The Attorney General is authorized to compromise and settle and make an award in an amount not to exceed $100,000 on any claim timely filed under this act as amended ... on the basis of affidavits, available Government records, and other information satisfactory to him.

(b) The United States Claims Court \* shall have jurisdiction to determine any claim timely filed under this Act.... A petition for the determination of a claim by the United States Claims Court shall be filed with the clerk of the said court and a copy of the petition shall be served upon the Attorney General by registered mail. Such a petition may be filed at any time after enactment of this subsection except that it must be filed within ninety days after the date of a notice by the Attorney General served on the claimant by registered mail that no further consideration will be given to the compromise of the claim. Upon the timely filing and serving of such petition, the United States Claims Court shall have jurisdiction to hear and determine said claim in the same manner and under the same rules as any other cause properly before it and applying rules of equity and justice. Upon being served with a copy of such petition, the Attorney General shall forthwith certify and transmit to the clerk of the United States Claims Court the original statement of the claim and any requested amendments thereto for filing with the said clerk as a preliminary record in the case.

*See also, Taki Sonoda v. United States,* 154 Ct.Cl. 130, 148–51, 1961 WL 8731 (1961) (providing full text of the Act).

\* Pursuant to the Federal Courts Administration Act of 1992, Pub.L. No. 102–572, § 902(a), 106 Stat. 4506, 4516 (1992), the United States Claims Court was renamed the United States

American Evacuation Claims Act attempted to rectify particular loss or damage to property, as well as injury to physical and mental health. In comparison, the Civil Liberties Act, was adopted in 1988 by Congress in an attempt to address the general harm of governmental intolerance, to formally apologize, and as best it could, make reparations to individuals of Japanese descent who were taken from their homes and/or forced to move to relocation camps during World War II. Congress substantiates this act of repentance with financial restitution to eligible individuals. Individuals who are "eligible" for redress under the Act are defined as:

> Any individual of Japanese ancestry who is living on the date of enactment of this Act, and who, during the evacuation, relocation and internment period . . . was confined, held in custody, relocated or otherwise deprived of liberty or property as a result of . . . [the United States government's actions].

Sections 1989b–3 through –5; 1989b–7(2).

In 1992, the Act was expanded, and the term "eligible individual" now includes the spouse or a parent of an eligible individual. *See,* Civil Liberties Act Amendments of 1992, P.L. 102–371, 106 Stat. 1167 (1992). In addition, "eligibility" requires that the harm described in the Act must have occurred between December 7, 1941 and June 30, 1946.

The Attorney General is charged with identifying and locating all "eligible individuals," and to provide them each with $20,000.00 from an established trust fund. The Attorney General has promulgated regulations in order to implement the Act's agenda. *See,* 54 Fed.Reg. No. 159, p. 34157, *et seq.* (28 C.F.R. Part 74). In 28 C.F.R. § 74.3 eligibility determinations are set forth as:

> (a) An individual is found to be eligible if such an individual:
>
> (1) Is of Japanese ancestry; and
>
> (2) Was living on the date of enactment of the Act, August 10, 1988; and
>
> (3) During the evacuation, relocation, and internment period was—
>
> (i) A United States citizen; or

Court of Federal Claims, effective October 29,

> (ii) A permanent resident alien who was lawfully admitted into the United States; or
>
> (iii) An alien, who after the evacuation, relocation and internment period, was permitted by applicable statutes to obtain status of permanent resident alien extending to the internment period; and
>
> (4) Was confined, held in custody, relocated, or otherwise deprived of liberty or property as a result of—
>
> (i) Executive Order 9066, dated February 19, 1942;
>
> (ii) The Act entitled "An Act to provide a penalty for violation of restrictions or orders with respect to persons entering, remaining, leaving, or committing any act in military areas or zones," approved March 21, 1942; or
>
> (iii) Any other Executive order, presidential proclamation, law of the United States, or other action taken by or on behalf of the United States or its agents, representatives, officers, or employees, respecting the evacuation, relocation, or internment of individuals solely on the basis of Japanese ancestry.

Pertinent to this case, is the fact that individuals who are deemed to have suffered a loss and are, therefore, eligible include:

> Individuals born in assembly centers, relocation centers or internment camps to parents of Japanese ancestry who had been evacuated, relocated or interned . . . including children born in the United States to parents of Japanese ancestry who were relocated to the United States from other countries in the Americas during the internment period.

Plaintiff, Douglas Ishida, is a citizen of the United States, and is of Japanese ancestry born on November 23, 1942. His parents, Japanese–American citizens, "voluntarily" evacuated from a "military zone" in Fresno, California, and relocated to Marion, Ohio, in February 1942. Plaintiff's parents each have qualified for and received reparation payments under the Act.

1992.

Plaintiff applied to the Office of Redress Administration, Civil Rights Division, for expiation under the Act on May 26, 1992. On July 21, 1992, plaintiff was denied redress under the Act on the grounds that he was ineligible. Plaintiff filed an administrative appeal to the Assistant Attorney General, Civil Rights Division and, on January 14, 1993, the reconsideration request was denied. The denial stated the following:

> Under the regulations implementing the Act, children who were "born in assembly centers, relocation camps and internment camps" are eligible for redress compensation.... However, the regulations "do not include as eligible, children born after their parents had voluntarily relocated from prohibited military zones, or from assembly centers, relocation camps or internment camps." ... Therefore, because [plaintiff] was born after his parents relocated from a prohibited military zone, he is not an "individual ... confined, held in custody [or] relocated" within the meaning of the Act.

Subsequent to this decision, plaintiff filed the instant complaint with this court challenging DOJ's denial of his claim for compensation under the Act. Plaintiff's argument is twofold: first, he argues that the Agency's decision was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. Second, plaintiff maintains that DOJ's implementation of the Act, through its regulation, is unconstitutional.

### I. *Summary Judgment*

Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. RCFC 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986); *Jay v. Secretary, DHHS*, 998 F.2d 979 (Fed. Cir.1993). A fact is material if it might significantly affect the outcome of the suit under the governing law. *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510.

The party moving for summary judgment bears the initial burden of demonstrating the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325,

106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986), *cert. denied*, 484 U.S. 1066, 108 S.Ct. 1028, 98 L.Ed.2d 992 (1988); *Jay*, 998 F.2d at 982. If the moving party demonstrates an absence of genuine issues of material fact, then the burden shifts to the non-moving party to show that a genuine factual dispute does exist. *Sweats Fashions, Inc. v. Pannill Knitting Co.*, 833 F.2d 1560, 1563 (Fed.Cir. 1987). Alternatively, if the moving party can show that there is an absence of evidence to support the non-moving party's case, then the burden shifts to the non-moving party to proffer such evidence. *Celotex*, 477 U.S. at 325, 106 S.Ct. at 2553–54.

The court must resolve any doubts about factual issues in favor of the non-moving party, *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986), *cert. denied*, 481 U.S. 1029, 107 S.Ct. 1955, 95 L.Ed.2d 527 (1987); *Litton Industrial Products Inc. v. Solid State Systems Corp.*, 755 F.2d 158, 163 (Fed.Cir.1985), to whom the benefit of all presumptions and inferences run. *Jay*, 998 F.2d at 982; *H.F. Allen Orchards v. United States*, 749 F.2d 1571, 1574 (Fed.Cir.1984), *cert. denied*, 474 U.S. 818, 106 S.Ct. 64, 88 L.Ed.2d 52 (1985).

The fact that both parties have moved for summary judgment, does not relieve the court of its responsibility to determine the appropriateness of summary disposition. *Prineville Sawmill Co. v. United States*, 859 F.2d 905, 911 (Fed.Cir.1988). Summary judgment will not necessarily be granted to one party or another, just because both parties have moved for summary judgment. *Corman v. United States*, 26 Cl.Ct. 1011, 1014 (1992) (*citing LewRon Television, Inc. v. D.H. Overmeyer Leasing Co.*, 401 F.2d 689, 692–93 (4th Cir.1968), *cert. denied*, 393 U.S. 1083, 89 S.Ct. 866, 21 L.Ed.2d 776 (1969)). A cross-motion is a party's claim that it alone is entitled to summary judgment. It does not follow, however, that if one motion is rejected the other is necessarily supported. The court must evaluate each party's motion on its own merit, and resolve all reasonable inferences against the party whose motion is under consideration. *Corman*, 26 Cl.Ct. at 1014.

## II. *Validity of DOJ's Determination*

█ The Act provides that the Standard of Review is whether the Agency action was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. *See,* 50 U.S.C. app. § 1989b–4(h)(1). Ordinarily, an administrator's determination would be reviewed by the Court of Federal Claims under the standards articulated in the Administrative Procedure Act (APA), 5 U.S.C. §§ 701–06 (1993); *see, Simons v. United States,* 25 Cl.Ct. 685, 694 (1992), *aff'd,* No. 93–5122 sl. op., 1994 WL 24859 (Fed.Cir. 1994); *Stegall v. United States,* 19 Cl.Ct. 765, 769–70 (1990). The APA, 5 U.S.C. § 706, provides standards for judicial review of administrative actions, which includes determination of all relevant questions of law, interpreting constitutional and statutory provisions, and determining the meaning or applicability of the terms of an agency action. While plaintiff is entitled to appeal from the final agency action which is subject to judicial review, such review is not as broad as that described in 5 U.S.C. § 706. Further, this court cannot substitute its judgment for that of the Assistant Attorney General, but must make its determination based on the administrative record, *i.e.,* the Agency's interpretation and application of the Act based on plaintiff's factual circumstance.

Defendant states that the grounds for denying Mr. Ishida's claim is based upon a straightforward application of the regulations promulgated by DOJ. Defendant states that "children born *after* their parents had voluntarily relocated from prohibited military zones, or from assembly centers, relocation camps" are not eligible to receive compensation under the Act. 54 Fed.Reg. 34160 (August 18, 1989). [Emphasis added.] Defendant, however, concedes that this is actually a *policy* in connection with the Act, but is not yet published in the Code of Federal Regulations. Instead, this policy was established by "rule," subject to notice and comment rulemaking procedures, and was circulated as part of the Federal Register.

On the other hand, 28 C.F.R. § 74.3(b)(7), affirmatively states that an individual is eligible for compensation if he/she was born in an assembly center, relocation camp or internment camp, to parents of Japanese ancestry. Plaintiff agrees that he does not conform with either the provision set forth in 28 C.F.R. § 74.3(b)(7), or the "policy" announced in 54 Fed.Reg. 34160 (August 18, 1989). Instead, plaintiff argues that the regulation itself does not comply with the Act's requirements, because he is an "Eligible Individual" as defined by Congress. Specifically, plaintiff cites to the more general language of the Act which provides redress for individuals who were "otherwise deprived of liberty or property as a result of [the United States government's actions] combined with the time period when the deprivation must have occurred" (December 7, 1941 through June 30, 1946). Plaintiff contends that because he was born during that critical time period, to parents of Japanese ancestry who voluntarily relocated (and were compensated for this), he was also deprived of liberty and property.

It is evident that the Agency, in making the determination that plaintiff was ineligible, did not act in an arbitrary or capricious manner. The Agency applied its regulations, which is perhaps more clear when considered *together* with its "policy" discussed in 54 Fed.Reg. 34160. Plaintiff's argument, however, requires this court to determine if the Agency's decision was actually in accordance with the law, and in this case specifically, the Civil Liberties Act of 1988.

█ The court, however, cannot determine this in isolation. This question is one of statutory interpretation, which must be resolved with deference to the Agency's interpretation. *Suramerica de Aleaciones Laminadas, v. United States,* 966 F.2d 660, 663 (Fed.Cir.1992). When considering the Agency's construction of 50 U.S.C. app. § 1989, this court must only determine whether the Agency's "interpretation of its statutory power falls within the range of permissible construction." *Id.* at 667. The Supreme Court has clearly stated that a court may not substitute its own construction of a statutory provision for any reasonable interpretation made by the administrator of an agency. The principle set forth in *Chevron United States, Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 844, 104 S.Ct.

2778, 2782–83, 81 L.Ed.2d 694 (1984), was recently reiterated by the Federal Circuit in *Daewoo Electric v. United States,* 6 F.3d 1511 (Fed.Cir.1993), finding that:

Considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer, and the principle of deference to administrative interpretations has been consistently followed by this Court whenever decision as to the meaning or reach of a statute has involved reconciling conflicting policies, and a full understanding of the force of the statutory policy in the given situation has depended upon more than ordinary knowledge respecting the matters subjected to agency regulation. *Id.* [6 F.3d at] 1515–16. See also, *Zenith Radio Corp. v. United States,* 437 U.S. 443, 450[, 98 S.Ct. 2441, 2445, 57 L.Ed.2d 337] (1978).

When considering the Agency's interpretation of the statute, the Supreme Court in *Chevron United States, Inc.,* requires the reviewing court to first question whether Congress has spoken to the precise issue. If the court can glean a clear intent, then it, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court finds that Congress has not directly addressed the precise issue, then the second question which the court must consider is whether the agency's "answer" is based on a permissible construction of the statute. Thus, where the statute is silent or ambiguous, the court itself is not at liberty to impose its own construction of the statute. *Chevron United States, Inc.,* 467 U.S. at 842–43, 104 S.Ct. at 2781–82. Furthermore, the court should not second-guess an Agency's regulation unless it clearly contravenes legislative intent. *DeCosta v. United States,* 987 F.2d 1556, 1558 (Fed.Cir. 1993); *True v. Office of Personal Management,* 926 F.2d 1151, 1155 (Fed.Cir.1991).

Irrefutably, the Act does not *explicitly* state that individuals, born after their parents voluntarily relocated, are eligible for payment. The real dilemma, in what seemingly appears to be purposeful generality by Congress, is how the court should treat the inclusion the catch-all phrase "otherwise deprived of liberty or property." Plaintiff argues that the court can define a clear intent from Congress, and points to the legislative history preceding the Act.

After extensive independent research by Congress' Commission on Wartime Relocation and Internment of Civilians, a comprehensive report was published in 1982 entitled *Personal Justice Denied. See, Personal Justice Denied, Committee print No. 6, U.S. House of Representatives Committee on Interior and Insular Affairs (GPO, March 1992).* Based on this report, which was the first to analyze the plight of citizens and resident aliens of Japanese ancestry in the 1940's, and upon other independent investigation, Congress enacted the Civil Liberties Act of 1988. Plaintiff cites to Congress' intent to ameliorate and compensate individuals of Japanese ancestry, for past deprivations of civil liberties by the United States government. Further, plaintiff denotes Congress' recognition of the "enormous damages both material and intangible," as well as, "incalculable losses in education and job training" which were largely the consequences of "racial prejudice, wartime hysteria, and a failure of political leadership." 50 U.S.C. § 1989a(a). Plaintiff argues that the Act does not provide redress to specific individuals, but attempts to rectify the harm to an entire racial class.

Plaintiff suggests that Congress intended the Act to be interpreted broadly, as evidenced by both the general wording of "otherwise deprived of liberty," and the 1992 Amendments which include a "benefit of the doubt section." 50 U.S.C. § 1989b–4(a)(3). The new section provides:

When, after consideration of all evidence and relevant material for determining whether an individual is an eligible individual, there is an approximate balance of positive and negative evidence regarding the merits of an issue material to the determination of eligibility, the benefit of the doubt in resolving each issue shall be given to such individual.

Indeed, plaintiff stresses that when Congress chose to exclude an individual, it did so explicitly. For example, those who "relocated to a country while the United States was

at war with that country" are ineligible for compensation under the Act. 50 U.S.C. § 1989b–7(2)(B). *See also, Suzuki v. United States,* 29 Fed.Cl. 688 (1993). Thus, he concludes, that Congress (by including such general language) has expressed a clear intent to compensate any individual of Japanese ancestry residing in this country, who was affected by the discriminatory policy of the United States government during the 1940s.

Defendant avers that the court cannot find such an intent, and that DOJ's determination, that "otherwise deprived of liberty or property" does not extend to individuals born after their parents relocated, is correct. It contends that this court should defer to DOJ's interpretation, as long as it is reasonable.

Apparent from the parties arguments, is the fact that they are really debating what provision of the Act accurately conveys Congress' intent. Defendant seems to miss that plaintiff is not arguing that the wording "otherwise deprived of liberty or property" specifically applies to him. Rather, plaintiff contends that Congress drafted the statute so broadly, that anyone of Japanese ancestry who was deprived of liberty or property as a result of government policy, would be an eligible candidate to receive compensation.

Plaintiff's argument, although quite compelling, is just too tenuous for the court to overrule the Agency's decision in this case. In arriving at this decision, the court considered the legislative history to glean the congressional intent behind the statute; however, what the court finds most informative are the 1992 Amendments. Defendant suggests that these amendments could have, but did not, directly address plaintiff's plight. Furthermore, it avers that, Congress was aware of the Agency's policies excluding someone in plaintiff's circumstance from receiving compensation; and by its *inaction,* Congress agreed with defendant's interpretation of the Act. While this is somewhat persuasive evidence, looking at what Congress *did* do, is far more telling. In 1992, Congress specifically expanded the term "eligible individual" to include spouses and parents of eligible individuals. The definitional section now reads that an "eligible individual" is: "any

individual of Japanese ancestry, or the spouse or a parent of an individual of Japanese ancestry, who is living on the date of the enactment of the Act and who, during the evacuation, relocation, and internment period ... was a United States citizen or a permanent resident alien; and ... was confined, held in custody, relocated, or otherwise deprived of liberty or property as a result of [United States government's actions]."

Plaintiff argues that he is eligible, merely because he is of Japanese ancestry, living during the statute's critical time period, and was subjected to the United States government policy of discrimination. Yet, the "parent" (who is presently included by amendment under the Act) also would be of Japanese ancestry, living in the United States during the critical time period, and subjected to the same governmental prejudice. Thus, if the Act already applied to such a broad category of people, then there would be no need to specifically expand the Act to include "parents." That expansion, included in the 1992 Amendments, demonstrates Congress' conception of a more inclusive statute than what plaintiff suggests.

In addition, if the court were to accept plaintiff's argument, it would open the door to virtually any person of Japanese ancestry (except those specifically excluded), living in the United States during the 1940's, to seek compensation. It is obvious that any person of Japanese ancestry living anywhere in the United States during this time period was subject to irrational and unjustified bias. For instance, there is arguably little difference between any person of Japanese ancestry who was born in Marion, Ohio, but could not travel to California from 1942 to 1946, and plaintiff, who was also born in Marion, Ohio, because his parents were required to relocate from California, and thereby denied the right of interstate travel. While, the Act reflects a general concern for all the people who suffered, it could not offer reparations to such a voluminous amount of possible claimants. Instead, redress is dedicated to those more directly affected.

Finally, plaintiff argues that this is not an income tax statute where the government is directed to closely protect the Treasury; in-

stead, the Act directs the Attorney General to seek out and liberally compensate those who were afflicted. Congress, however, did not appropriate limitless funds for the trust, and some qualifying conditions must apply. Unquestionably, many more people, than are covered by the Act, endured unbearable circumstances. Congress, however, chose to limit the group of eligible recipients.

Thus, the court finds that the DOJ has complied with the underlying policies of the Act, and the regulations promulgated by the Agency cannot be disturbed by the court.

### III. Constitutionality of DOJ's Regulations

█ Plaintiff maintains that DOJ's classification making him ineligible to receive compensation under the Act is in violation of the Equal Protection Provisions of the Fifth Amendment. Plaintiff first contends that the level of scrutiny for a remedial measure to benefit a racial class of persons affected by discrimination, is unclear. He cites to United States v. Paradise, 480 U.S. 149, 166-67, 107 S.Ct. 1053, 1063-64, 94 L.Ed.2d 203 (1987), where the Court determined that although strict scrutiny has consistently been applied to racial or ethnic distinctions, it had not arrived at a consensus as to what level of scrutiny should be applied for remedial purposes. The Court avoided making a final determination, by concluding that the remedial order in question, would even survive strict scrutiny. Id. at 167, 107 S.Ct. at 1064. Plaintiff requests that this court apply the strict scrutiny analysis to DOJ's regulation and determine whether it is narrowly tailored to serve a compelling governmental purpose.

Although the Act is somewhat remedial, it does not address the same constitutional considerations as in Paradise. While the Act identifies the government's outrageous conduct and intolerance of the past, it certainly does not assume that the "token" payment actually remedies that prior injustice. Instead, the payments are a non-contractual benefit, similar to those of a social welfare program, rather than a remedial measure affecting present discrimination. See, Weinberger v. Salfi, 422 U.S. 749, 768, 95 S.Ct. 2457, 2468, 45 L.Ed.2d 522 (1975). Further,

and most importantly, because the Act is not a measure which rectifies a current discriminatory practice, its enforcement will not confer a present essential benefit, such as liberty or property, upon the individual. See, Cleveland Bd. of Education v. Lafleur, 414 U.S. 632, 94 S.Ct. 791, 39 L.Ed.2d 52 (1974) (invalidating rule for mandatory maternity leave requiring pregnant public school teachers to take unpaid maternity leave five months before childbirth confers present essential benefit); Stanley v. Illinois, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972) (invalidating statutory scheme which provided no suitability hearing where child of unmarried father, upon death of mother, was declared a state ward, confers a present essential benefit); United States v. Paradise, 480 U.S. 149, 107 S.Ct. 1053, 94 L.Ed.2d 203 (1987) (continuing discrimination by Police department against African–Americans led to a constitutional order requiring promotion of one African–American for one white-American, thereby conferring a present essential benefit). Compare the Act to the Public Works Employment Act of 1977, which was the subject of Fullilove v. Klutznick, 448 U.S. 448, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980). There, in the Public Works Employment Act, Congress included the Minority Business Enterprise (MBE) provision, requiring that 10 percent funds granted for public works must go to identified minority groups. The Supreme Court declared this provision constitutional "because of the continuing effects of past discrimination ... [and that] minority underrepresentation is substantial and chronic, and the handicap of past discrimination is impeding access of minorities to the benefits of the governmental program. In these circumstances remedying their present effects of past racial discrimination is a sufficient important governmental interest to justify the use of racial classifications." [Citations omitted.] Id. at 520, 100 S.Ct. at 2796 (Marshall, J., concurring). In this case, however, plaintiff or other people of Japanese ancestry are no longer suffering from prejudicial acts sponsored by the government; furthermore, the Act cannot "undo" what has already happened. Instead, Congress realizes the trauma suffered by Japanese–Americans during this time period, and extends a symbolic

apology of $20,000.00, which is a non-essential benefit. The Supreme Court has consistently held that excluding certain people from receiving a non-essential benefit will be constitutional as long as the exclusions are rationally related to legitimate legislative objectives. *Califano v. Aznavorian*, 439 U.S. 170, 175–79, 99 S.Ct. 471, 474–76, 58 L.Ed.2d 435 (1978); *Weinberger v. Salfi*, 422 U.S. 749, 767–77, 95 S.Ct. 2457, 2467–73, 45 L.Ed.2d 522 (1975). "A non-contractual claim to receive funds from the public treasury enjoys no constitutionally protected status" although, there may not be invidious discrimination among such claimants. *Id.* at 772, 95 S.Ct. at 2470. This court agrees with the finding in *Suzuki*, that the rational relation standard applies to due process questions concerning the Act. *Id.* 29 Fed.Cl. at 693–94. The same standard will apply here where plaintiff is not arguing that the Act itself is unconstitutional, but rather he challenges the constitutionality of DOJ's regulation excluding individuals such as himself from receiving compensation. Thus, the regulations must be rationally related to the legislative intent of the Act and Due Process will "interpose a bar only if the [regulation] manifests a patently arbitrary classification, utterly lacking in rational justification." *Salfi*, 422 U.S. at 768, 95 S.Ct. at 2468.

Essentially, a classification will lack rational justification if it invidiously discriminate[d] among such claimants on the basis of a "bare [Agency] desire to harm" persons in plaintiff's circumstance. *Salfi*, 422 U.S. at 772, 95 S.Ct. at 2470. The record holds no evidence of DOJ's desire to damage individuals born after their parents relocated. Defendant was given the administrative task of promulgating regulations to serve the purpose of the Act. The regulations allow for a broad category of eligible individuals to receive compensation, but those individuals were presumably the most directly affected. Accordingly, the regulation is rationally related to Congress' legitimate legislative goal and is, therefore, constitutional.

### Conclusion

For the reasons stated above, the court will not disturb the Agency's decision denying plaintiff reparations. Defendant's motion for summary judgment is granted; plaintiff's motion for summary judgment is denied. Accordingly, the Clerk is directed to dismiss the complaint. No costs.

United States Court of Federal Claims.