Lawrence **MARKS**, et al., **Plaintiffs,**

v.

**UNITED STATES, Defendant.**

No. 506–89L.

United States Court of Federal Claims.

Nov. 6, 1995.

Robert L. Parks, Anderson, Moss, Parks & Russo, P.A., Miami, Florida, attorney of record, for plaintiffs.

Dorothy R. Burakreis, General Litigation Section, Land and Natural Resources Division, Department of Justice, Washington, D.C., with whom were the Assistant Attorney General, attorneys of record, for defendant; William Baxter, Assistant District Counsel, Jacksonville District, of counsel.

## OPINION

HORN, Judge.

The above-captioned case is presently before this court on defendant's motion to dismiss for lack of jurisdiction, pursuant to Rule 12(b)(1) of the Rules of the United States Court of Federal Claims (RCFC) and 28 U.S.C. § 1500 (1988 & Supp.1993), as well as

on defendant's motion for summary judgment and plaintiffs' cross-motion for partial summary judgment, both pursuant to RCFC 56.[1] Plaintiffs in this action seek compensation from the United States Army Corps of Engineers ("the Corps") for an alleged temporary taking of wetlands located in Key West, Florida. In their complaint, plaintiffs allege that "the Army Corps' improper exercise of jurisdiction over the subject parcels constitutes a temporary taking since the imposition of the cease and desist order in January, 1973 and has continued to date." Defendant denies liability, initially claiming a lack of jurisdiction. In the alternative, defendant argues that plaintiffs' taking claim is unsupported in both fact and law.

## FACTUAL BACKGROUND

The property in dispute consists of two adjacent parcels of land in Key West, Florida, near the Key West airport, known as Parcel 34 and Parcel 38.[2] The property is bounded on the north by the Riviera Canal, a man-made waterway subject to tidal fluctuation and connected to the Atlantic Ocean and Cow Key Channel. Riviera Canal is a navigable body of water which is connected to the Atlantic Ocean. Parcel 38 consists of approximately 52 acres, the northern portion of which is a low lying, salt marsh area subject to tidal fluctuations. Parcel 34 consists of a 60 foot strip of property, which connects Roosevelt Boulevard on the east to Parcel 38 on the west, and is the only ingress and egress to Parcel 38. On June 13, 1972, plaintiff, Lawrence Marks, on behalf of himself and his uncles, Herman, Paul, Eugene and Stanley Marks purchased an undivided one-half interest in Parcel 38 from Osnardo Dra-

---

1. Following enactment of the Court of Federal Claims Technical and Procedural Improvements Act of 1992, Pub.L. No. 102–572, the United States Claims Court was renamed the United States Court of Federal Claims. In accordance with General Order 33 issued by the United States Court of Federal Claims, the court adopted the rules of the United States Claims Court. The substance of the rules of the court is unaffected by the legislation, other than with respect to the name change of the court and, therefore, the name change of the rules. However, General Order 33 also indicates that if there is a conflict between the new statute and the rules, the statute will control.

2. In making its findings of fact, this court relies, in part, on the memorandum opinion containing findings of fact and conclusions of law of the United States District Court for the Southern District of Florida, Case No. 79–2323–Civ–SMA, dated January 15, 1982, and upon the agreed to facts derived by comparing defendant's "Proposed Findings of Uncontroverted Fact" filed with this court on November 7, 1990 and plaintiff's "Unilateral Memorandum of Fact and Law" sent by plaintiff to the court and to the defendant on May 19, 1992.

go and Joaquin Pijuan, and also purchased whatever interest the sellers had in Parcel 34. Fee simple title to the access strip, known as Parcel 34, was not acquired until April 29, 1980.

In November 1972, the City of Key West enacted rezoning Ordinance No. 72–37, which permitted construction of four-story apartment complexes and amended the maximum density to allow 22 units per acre. Plaintiffs in this case intended to build and develop the property at issue in accordance with that ordinance. On November 21, 1973, Lawrence, Herman, Paul, Eugene and Stanley Marks, and Osnardo Drago entered into an agreement with Context Industries regarding the sale and development of Parcel 38, and entered into a supplemental agreement on December 12, 1973. Shortly thereafter, on December 28, 1973, the parties signed a final agreement, which transferred Parcel 38 to a new company, Context–Marks Corporation, which was organized for the specific purpose of developing the property.[3] On May 12, 1980, as a result of the settlement of a mortgage foreclosure action on the property, *Carlos, et al. v. Context–Marks, et al.,* No. 75–1025–CA–09, Fla. 16th Cir.Ct., Context–Marks Corporation became Marks Development, Inc. Subsequently, on December 27, 1984, Marks Development, Inc. conveyed a 10% undivided interest in Parcel 38, and in whatever interest existed in Parcel 34, to Herman, Paul, Eugene and Stanley Marks, and a 60% interest to Lawrence Marks.

Plaintiff, Island in the Sun Condominiums of Key West, Florida, Inc. ("Island in the Sun"), filed its articles of incorporation on December 29, 1972. Island in the Sun was formed for the purpose of developing and constructing condominiums on Parcel 38, however, Island in the Sun, originally, did not hold ownership interest in the property.

Later, on June 26, 1986, the Marks plaintiffs conveyed all of their interest in Parcel 34 to plaintiff Island in the Sun, which then conveyed that interest to the City of Key West.

On or about November 1, 1972, in anticipation of developing Parcel 38 as a multi-unit apartment complex and marina, and in accordance with the Master Plan of the City of Key West and its applicable zoning regulations, plaintiffs applied for and received a dredge and fill permit from the City of Key West. Plaintiffs began their fill operation on Parcel 38 in November and December of 1972. A perimeter berm was completed during December, 1972. Dredging and filling activity, therefore, commenced without a permit from the Corps having been issued. At the time the fill operation on the property was commenced, the Randall Act, Florida Statute 253.135(2), which exempted property within Key West from state requirements for dredge and fill permits, was in full force and effect. Also, at the time the fill operation was commenced in November and December of 1972, neither the State of Florida nor the Corps generally asserted jurisdiction over any property above the mean high water line,[4] and neither the federal government nor the State of Florida had been requiring permits to fill below the mean high water line in this area.

On January 24, 1973, the Army Corps of Engineers issued a cease and desist order by telegram concerning the placement of fill on Parcel 38. The telegram addressed to Thompson P. Carlos, counsel to the plaintiffs, stated:

1. IT IS OUR UNDERSTANDING THAT YOU REPRESENT MESSRS LAWRENCE M MARKS, OSNARDO DRAGO AND JOAQUINA C PIJUAN WHO ARE ENGAGED IN PLACING

---

3. Later, by deed, dated April 29, 1980, Context–Marks acquired Parcel 34 for $6,000.00.

4. Mean high water was defined in the opinion (Case No. 79–2323–Civ–SMA), issued by the United States District Court for the Southern District of Florida on January 15, 1982, as follows:

 Mean high water is a term used to designate the arithmetic average of the height above mean sea level of all high tides over a period of 18.6 years. Mean high water at a given geo-graphic location is determined by the establishment of interim tide stations and measuring short term simultaneous differences between readings at those stations and the reading at the operating stations which were established more than 19 years prior to the current measurements. By applying known constants for the 19 year station to the shorter term stations, the equivalent of a 19 year value is interpolated.

FILL IN THE NAVIGABLE WATERS OF THE UNITED STATES ADJACENT TO THE RIVIERA CANAL AND JUST NORTH OF KEY WEST INTERNATIONAL AIRPORT, KEY WEST, MONROE COUNTY, FLORIDA.

2. SECTION 10 OF THE RIVER AND HARBOR ACT OF 3 MARCH 1899 (33 USC 403) PROHIBITS SUCH WORK UNLESS IT IS PROPERLY AUTHORIZED BY A DEPARTMENT OF THE ARMY PERMIT.

3. THERE IS NO RECORD OF A DEPARTMENT OF THE ARMY PERMIT BEING ISSUED FOR THIS WORK.

44. [SIC] ACCORDINGLY, YOU ARE HEREBY ADVISED THAT YOUR CLIENTS SHOULD CEASE AND DESIST ALL UNAUTHORIZED WORK BELOW THE MEAN HIGH WATER LINE IMMEDIATELY. FURTHER OPERATIONS MAY SUBJECT THEM TO MULTIPLE COUNT PROSECUTION.

This telegram was followed by a letter, dated April 9, 1973, from the Corps ordering removal of the fill. The letter stated, in pertinent part:

Since a Department of the Army permit has not been issued for the placement of this fill, you are directed to notify your clients, Messrs.Lawrence M. Marks, Osnardo Drago and Joaquin C. Pijuan, to remove all fill placed below the mean high water line in the navigable waters of the United States. You are further directed to complete the removal of this fill by 22 May 1973.

This fill material should be removed in such a manner as to insure that the original elevation is obtained. Let us caution you that removal of additional material, that material not placed as fill, would be considered by this office to be an additional violation of 33 U.S.C. 403. Also, the fill material that is removed should not be placed below the mean high water line in an area that is not properly authorized by a Department of the Army permit.

Although the cease and desist order specifically referenced work below the mean high water line, it did not preclude filling above the mean high water line.

Upon receipt of the cease and desist order, plaintiffs stopped all fill activity. Thereafter, plaintiffs and the United States government entered into a stipulation in a criminal information proceeding in the United States District Court for the Southern District of Florida, Case No. 73–509–Cr–WM, charging unauthorized filling of Parcel 38, and that Island in the Sun was the party responsible for the alleged infractions. On August 16, 1973, Island in the Sun plead *nolo contendere* to the criminal information and the corporation received a $500.00 fine. At the time of the cease and desist order, the parties had not yet agreed upon a compromise. However, the parties ultimately agreed upon a compromise mean high water line.

Thereafter, Charles Netter, acting on behalf of the plaintiffs, submitted an after-the-fact application for a permit to dredge and fill below the mean high water line, dated June 14, 1973, and revised July 31, 1973. The proposed work included maintaining existing fill which had been illegally placed without a permit below the mean high water line, as well as completing the proposed marina project. Island in the Sun also applied to the State of Florida for water quality certification. The State of Florida denied that application on April 2, 1974, stating that "the project as proposed will have definite long-term adverse effects on the water quality of the Class III waters of the immediate waterway area, Cow Key Channel and will be contrary to policy of the Board of the Department of Pollution Control." Because state certification was a prerequisite to the issuance of a permit under either 33 U.S.C. § 403 (1972) or 33 U.S.C. § 1341 (1972), the Corps denied the corporation's permit application to dredge the marina on July 11, 1974. At that time, plaintiffs were ordered by the Corps to "remove all fill placed in the area agreed upon as below mean high water" by September, 1974.

Plaintiffs appealed the permit denial within the state agency, and in January 1976, the Secretary of the Florida Department of Environmental Protection Regulation issued a final order denying water quality certification

and the state permits. The state action was upheld on administrative appeal. Plaintiffs then appealed the denial to the Florida state courts. On October 10, 1977, the Florida Supreme Court denied a petition for certiorari and upheld the state court's May 3, 1977 decision denying certification. *Island-in-the-Sun Condominium of Key West, Inc. v. Governor & Cabinet,* 345 So.2d 831 (Fla.Dist.Ct. App.), *cert. denied,* 352 So.2d 172 (Fla.1977).

On October 26, 1977, and again on November 14, 1977, after plaintiffs had exhausted all administrative and judicial remedies, the Corps reiterated its order to remove the fill from below the compromise mean high water line on Parcel 38. When plaintiffs failed to comply, the Corps brought an enforcement action on October 21, 1980, seeking a permanent injunction and requiring Marks Development, Inc. to remove approximately 20,000 cubic yards of fill material from navigable waters of the United States allegedly placed below the mean high water line on the Parcel 38 property. The Florida State Department of Environmental Regulation intervened in the district court action for the sole purpose of supporting the claims of the federal government, not to assert any independent claims. In August 1980, the defendants in the district court case (plaintiffs in the instant case), Case No. 79–2323–Civ–SMA, asserted numerous affirmative defenses and counterclaims, including a request for compensation due to an alleged taking.

Following a trial, in a memorandum opinion, the district court dismissed the taking claims against the United States, as well as against the State of Florida. The district court issued a memorandum opinion which stated that because of the inability of the Corps to dispositively determine the location of the mean high water line in January, 1973, the developers were "unable to proceed with the project for fear that additional impermissible filling would take place." The district court, ultimately, adopted the demarcation of the mean high water line which had been previously agreed upon by the parties. The district court found:

> The original cease and desist order did *not* preclude filling of property *above* the mean high water line since the Corps did not exercise jurisdiction over land above the mean high water line. Had not the Corps intervened in the subject property by issuing its cease and desist order at a time when there was no precise determination of the mean high water line, then the property filled above the mean high water line would have been grandfathered in and *exempt* from the Corps' subsequent 1975 wetlands policy.

The United States District Court specifically declined to adopt the argument presented by the Corps that defendants (plaintiffs in the instant case) should be subject to the retroactive application of the Corp's revised wetlands policy, which would require a § 403 permit for property above the mean high water line in addition to property below the mean high water line. Accordingly, the district court enjoined the United States and the State of Florida from imposing any permit requirements on Parcel 38 property above the mean high water line, as delineated in the previously agreed upon compromise between the parties. The court further concluded that the defendants (plaintiffs in the instant case) should be free to fill and develop the property, subject to compliance with the applicable City of Key West, Florida requirements. The court, however, conditioned the filling and development activity on the partial restoration by defendants (plaintiffs in the instant case) of the area below the compromise mean high water line, thus granting, in part, the government's request for restoration. Specifically, the court ordered the defendants (plaintiffs in the instant case) to restore tidal fluctuations to impounded areas and to promote the free flow of aquatic organisms, by means of breaks in the berms already constructed below the mean high water line. The decision of the district court regarding Parcel 38 was affirmed by the United States Court of Appeals for the Eleventh Circuit. *United States v. Marks Dev, Inc.,* No. 79–2323–Civ–SMA (S.D.Fla. Jan. 15, 1982), *aff'd sub nom. United States v. Context–Marks Corp.,* 729 F.2d 1294 (11th Cir.1984).

Plaintiffs acquired full title to Parcel 34, the property immediately adjacent to Parcel 38, on April 29, 1980, and filling activity on

Parcel 34 began in 1986. The filling on Parcel 34 was incidental to the widening and paving of an existing road, the sole access to Parcel 38. Again, the Corps threatened plaintiffs with a cease and desist order, this time with respect to the filling of the sixty (60) foot wide strip of road situated on Parcel 34, which connected Roosevelt Boulevard on the east to Parcel 38 on the west. Plaintiffs challenged the Corps' action in the United States District Court for the Southern District of Florida by filing a motion to enforce the mandate in the prior Parcel 38 litigation.[5] The district court denied the plaintiffs' motion to enforce the mandate, without prejudice to the filing of a separate and independent action in any court of competent jurisdiction, including the United States District Court for the Southern District of Florida, or to seeking administrative relief. In support of its denial, the United States District Court concluded that because the full width of the roadway in Parcel 34 was not encompassed within the scope of the complaint, counterclaim, memorandum opinion, final judgment and/or Eleventh Circuit opinion, which all dealt only with Parcel 38, the district court lacked subject matter jurisdiction to enforce the mandate regarding activity on Parcel 34.

On November 4, 1988, plaintiffs sought relief in the United States District Court for the Southern District of Florida (Case No. 88–10081–CIV–King). The plaintiffs asked for declaratory and injunctive relief to determine the legality and constitutionality of the government actions. Plaintiffs also claimed damages in excess of $10,000.00 for the loss and use of their property, commencing with the imposition of the cease and desist order in January, 1973, based upon an alleged temporary taking of Parcels 34 and 38 by the Corps. The plaintiffs alleged that the improper requirement to seek a permit on Parcel 34 amounted to a violation of the Fifth Amendment to the Constitution, and prevent-

ed plaintiffs all economically feasible and reasonable beneficial use of their property, both Parcels 38 and 34.

Although the original complaint in the district court was comprised of five counts, only count I of the complaint remained pending before the district court as of the date of filing the above-captioned case in the United States Court of Federal Claims on September 18, 1989.[6] Plaintiffs had voluntarily dismissed count II in the district court on April 8, 1989. Subsequently, counts III, IV and V also had been dismissed by the district court on August 11, 1989. The remaining count, count I of plaintiffs' November 4, 1988 district court complaint, was titled COUNT I, COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF. Count I, paragraph 32, of the 1988 district court complaint specifically seeks declaratory, injunctive and other relief to determine the legality and constitutionality of actions respecting "all of plaintiff's property within the city limits of Key West...." Furthermore, paragraph 31 realleges those allegations contained in paragraphs one through twenty-six of the complaint, paragraphs that on at least twelve separate instances reference both Parcels 34 and 38. Consequently, the allegations in the relevant district court action cover both Parcels 34 and 38.

In the United States Court of Federal Claims, plaintiffs stated their request as a "Temporary Taking Against the Army Corps," also regarding both Parcels 34 and 38. Plaintiffs have not asked for injunctive or declaratory relief in this court. In response, defendant has filed a motion for summary judgment on Parcels 34 and 38, and plaintiffs have filed an opposition to defendant's motion for summary judgment, together with a cross-motion for partial summary judgment.[7] At the oral argument in this

---

5. The record reflects that on June 26, 1986, after the filing of the motion to enforce the mandate, but prior to the court's disposition of the case, Lawrence, Herman, Paul, Eugene and Stanley Marks conveyed all of their interests in Parcel 34 to Island in the Sun. Island in the Sun subsequently conveyed Parcel 34 to the City of Key West.

6. Thereafter, the sole remaining claim in the district court case, count I, was dismissed by stipulation on April 12, 1990, although that action was taken following the filing of the action in the United States Court of Federal Claims.

7. Although plaintiffs have titled their pleading a "Motion for Partial Summary Judgment," they appear to raise taking issues, which, if decided in their favor, could dispose of the whole case.

court, the defendant raised for the first time the issue of this court's jurisdiction, based on the impact of 28 U.S.C. § 1500, following the decision in the United States Court of Appeals for the Federal Circuit's *en banc* opinion in *UNR Industries v. United States*, 962 F.2d 1013 (Fed.Cir.1992), and the subsequent appeal of the case to the United States Supreme Court under the name *Keene Corp. v. United States*.[8] This court ordered further briefings addressing the impact of the above precedential decisions on the instant case. In response, the defendant filed a motion to dismiss claiming a lack of jurisdiction based on the pendency of another pending claim in the federal district court, pursuant to 28 U.S.C. § 1500. Therefore, currently pending before this court are defendant's motion to dismiss, pursuant to 28 U.S.C. § 1500, defendant's motion for summary judgment, and plaintiffs' cross-motion for partial summary judgment.

## DISCUSSION

■ When considering a motion to dismiss, the court may consider all relevant evidence in order to resolve any disputes as to the truth of the jurisdictional facts alleged in the complaint. *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 747 (Fed. Cir.1988). The court is required to decide any disputed facts which are relevant to the issue of jurisdiction. *Id.*

■ The basic standards for weighing the evidence presented by the parties when evaluating a motion to dismiss for lack of jurisdiction in the instant case, pursuant to RCFC 12(b)(1), have been articulated by the United States Supreme Court and the United States Court of Appeals for the Federal Cir-

cuit as follows: "in passing on a motion to dismiss, whether on the ground of lack of jurisdiction over the subject matter or for failure to state a cause of action, the allegations of the complaint should be construed favorably to the pleader." *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974); *accord Hamlet v. United States*, 873 F.2d 1414, 1416 (Fed.Cir. 1989).[9] In rendering a decision, the court must presume that the undisputed factual allegations included in the complaint by plaintiffs are true. *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d at 746; *Miree v. DeKalb County*, 433 U.S. 25, 27 n. 2, 97 S.Ct. 2490, 2492 n. 2, 53 L.Ed.2d 557 (1977).

■ The burden of establishing jurisdiction is on the plaintiffs. *McNutt v. General Motors Acceptance Corp.*, 298 U.S. 178, 189, 56 S.Ct. 780, 785, 80 L.Ed. 1135 (1936); *Pasco Enterprises v. United States*, 13 Cl.Ct. 302, 305 (1987); *Metzger, Shadyac & Schwartz v. United States*, 10 Cl.Ct. 107, 109 (1986). The court should not grant a motion to dismiss "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957). Moreover, "conclusory allegations unsupported by any factual assertions will not withstand a motion to dismiss." *Briscoe v. LaHue*, 663 F.2d 713, 723 (7th Cir.1981).

Defendant has moved to dismiss the above-captioned case, arguing that the pendency of claims in another court as of September 18, 1989, the date of filing the complaint in the United States Court of Federal Claims, prevents this court from exercising jurisdiction

8. *UNR Industries* involved a claim brought by Asbestos manufacturers against the United States to recover indemnification for liability to shipyard workers. The United States Claims Court granted the government's motion to dismiss in part, *Keene Corp. v. United States*, 17 Cl.Ct. 146 (1989). The United States Court of Appeals for the Federal Circuit, reversed, 911 F.2d 654 (Fed. Cir.1990), and rehearing *en banc* was granted, 926 F.2d 1109 (Fed.Cir.1991). Upon rehearing, the full court affirmed. *UNR Indus. v. United States*, 962 F.2d 1013 (Fed.Cir.1992). The United States Supreme Court granted certiorari on October 19, 1992, 506 U.S. 939, 113 S.Ct. 373, 121 L.Ed.2d 285 (1992), and affirmed the opin-

ion of the Claims Court. *Keene Corp. v. United States*, 508 U.S. 200, 113 S.Ct. 2035, 124 L.Ed.2d 118 (1993).

9. In general, the rules of this court are closely patterned on the Federal Rules of Civil Procedure. Therefore, precedent under the Federal Rules of Civil Procedure is relevant to interpreting the rules of this court, including RCFC 56. *See Jay v. Sec'y DHHS*, 998 F.2d 979, 982 (Fed. Cir.1993); *Imperial Van Lines Int'l Inc. v. United States*, 821 F.2d 634, 637 (Fed.Cir.1987); *Lichtefeld–Massaro, Inc. v. United States*, 17 Cl.Ct. 67, 70 (1989).

over the above-captioned case, pursuant to 28 U.S.C. § 1500. Defendant argues that the district court complaint filed by these plaintiffs, in November, 1988, was still pending at the time the instant suit was filed on September 18, 1989, thus depriving this court of jurisdiction. The statute, 28 U.S.C. § 1500, provides as follows:

> **Pendency of claims in other courts.**
> The United States Court of Federal Claims shall not have jurisdiction of any claim for or in respect to which the plaintiff or his assignee has pending in any other court any suit or process against the United States or any person who, at the time when the cause of action alleged in such suit or process arose, was, in respect thereto, acting or professing to act, directly or indirectly under the authority of the United States.

28 U.S.C. § 1500.

■ Congress has been given authority, pursuant to the Constitution of the United States, to define the jurisdiction of the courts. *See Keene Corp. v. United States,* 508 U.S. 200, 207–08, 113 S.Ct. 2035, 2040, 124 L.Ed.2d 118 (1993). Moreover, "[t]he limits upon federal jurisdiction, whether imposed by the Constitution or by Congress, must be neither disregarded nor evaded." *Owen Equipment & Erection Co. v. Kroger,* 437 U.S. 365, 374, 98 S.Ct. 2396, 2403, 57 L.Ed.2d 274 (1978).

According to the United States Court of Appeals for the Federal Circuit, the purpose of section 1500 is to "force an election where both forums could grant the same relief, arising from the same operative facts." *Johns–Manville Corp. v. United States,* 855 F.2d 1556, 1564 (Fed.Cir.1988), *cert. denied,* 489 U.S. 1066, 109 S.Ct. 1342, 103 L.Ed.2d 811 (1989). Otherwise stated, "[t]he purpose of section 1500 is to prohibit the filing and prosecution of the same claims against the United States in two courts at the same time." *Id.* at 1562. In the Supreme Court decision in *Keene Corp. v. United States,* the Court commented on the difficulty of applying 28 U.S.C. § 1500:

> The statutory notion of comparable claims is more elusive. By precluding jurisdiction over the claim of a plaintiff with a suit pending in another court 'for or in respect to' the same claim, § 1500 requires a comparison between the claims raised in the Court of Federal Claims and in the other lawsuit. The exact nature of the things to be compared is not illuminated, however by the awkward formulation of § 1500.

*Keene Corp. v. United States,* 508 U.S. at 210, 113 S.Ct. at 2041.

Prior to the *Keene* case, the United States Court of Appeals for the Federal Circuit had offered guidance regarding how courts should interpret the term "claim" in the context of 28 U.S.C. § 1500, when it wrote:

> Both the decision in *British American* [*British American Tobacco Co. v. United States,* 89 Ct.Cl. 438, 1939 WL 4266 (1939), *cert. denied,* 310 U.S. 627, 60 S.Ct. 974, 84 L.Ed. 1398 (1940) ] and the decision in *Los Angeles* [*Los Angeles Shipbuilding & Drydock Corp. v. United States,* 152 F.Supp. 236, 138 Ct.Cl. 648 (1957) ] are explicit in their interpretation of the term 'claim' in section 1500. Both reject the argument that 'claim' is based on legal theories. Both hold 'claim' to be defined by the facts. *British American* specifically applied this interpretation to a case involving tort and contract theories, the same theories raised in the instant appeal. A contrary interpretation would defeat the intent of Congress and would allow a plaintiff to bring duplicative actions on the same operative facts. 'The possibility of inconsistent judicial resolution of similar legal issues would then exist and the dual proceedings could result in unfair burden to the defendant, and unnecessary crowding of this court's docket and general administrative chaos.' *City of Santa Clara v. United States,* 215 Ct.Cl. 890, 893 [1977 WL 9595] (1977). Accordingly, we construe the term 'claim' in 28 U.S.C. § 1500 to be defined by the operative facts alleged, not the legal theories raised.

*Johns–Manville Corp. v. United States,* at 1562. This basic approach was confirmed by the Supreme Court in *Keene Corporation v. United States,* 508 U.S. at 212–14, 113 S.Ct. at 2043.

Subsequently, in *UNR Industries v. United States*, also interpreting 28 U.S.C. § 1500, the federal circuit addressed the chronological issues raised by section 1500, as follows:

1) if the same claim is pending in another court at the time the complaint is filed in the Claims Court, the Claims Court has no jurisdiction, regardless of when an objection is raised or acted on; 2) if the same claim is filed in another court after the complaint is filed in the Claims Court, the Claims Court is by that action divested of jurisdiction, regardless of when the court memorializes the fact by order of dismissal; and 3) if the same claim has been finally disposed of by another court before the complaint is filed in the Claims Court, ordinary rules of *res judicata* and available defenses apply.

*UNR Indus. v. United States*, 962 F.2d at 1021. In *Keene Corp. v. United States*, the Supreme Court reiterated the concepts outlined in *UNR Industries v. United States*, and stated that when applying the jurisdictional bar imposed by 28 U.S.C. § 1500, this court must adhere to the longstanding principle that "the jurisdiction of the Court depends upon the state of things at the time of the action brought." *Keene Corp. v. United States*, 508 U.S. at 207, 113 S.Ct. at 2040 (citing *Mollan v. Torrance*, 22 U.S. (9 Wheat.) 537, 539, 6 L.Ed. 154 (1824) (Marshall, C.J.)).

In *Keene Corp. v. United States*, the Supreme Court further refined the manner in which two pending cases should be analyzed regarding the application of section 1500, as follows:

These precedents demonstrate that under the immediate predecessor of § 1500, the comparison of the two cases for purposes of possible dismissal would turn on whether the plaintiff's other suit was based on substantially the same operative facts as the Court of Claims action, at least if there was some overlap in the relief requested.[6] [Citations omitted.]

*Id.* at 212, 113 S.Ct. at 2042–43. In footnote 6 to the above quote, however, the court stated:

6. Because the issue is not presented on the facts of this case, we need not decide whether two actions based on the same operative facts, but seeking completely different relief, would implicate § 1500. *Cf. Casman v. United States*, 135 Ct.Cl. 647 (1956); *Boston Five Cents Savings Bank, FSB v. United States*, 864 F.2d 137 (CA Fed.1988).

*Id.* at 212, 113 S.Ct. at 2043. The unanswered scenario identified by the Supreme Court in footnote 6 of the *Keene* case presents precisely the facts of the instant case.

More recently, the United States Court of Appeals for the Federal Circuit in *Loveladies Harbor, Inc. v. United States* seems to have resolved the dispute of whether two cases, in two separate courts, presenting the same facts, but requesting different relief, trigger section 1500.

For the Court of Federal Claims to be precluded from hearing a claim under § 1500, the claim pending in another court must arise from **the same operative facts**, and must seek **the same relief**. We know of no case arising from the same operative facts in which § 1500 has been held to bar jurisdiction over a claim praying for relief distinctly different from that sought in a pending proceeding.

*Loveladies Harbor, Inc. v. United States*, 27 F.3d 1545, 1551 (Fed.Cir.1994). Not only are the words "the same operative facts" and "the same relief" emphasized in the circuit court's language, but the two phrases also are connected by the words "and must."

■ Thus, pursuant to the language of 28 U.S.C. § 1500, and recent case law interpreting that provision, it is clear that this court may not exercise jurisdiction over an action if, at the time of its filing, the same plaintiffs have already filed another action in another court based on the same operative facts and requesting the same relief. 28 U.S.C. § 1500; *Loveladies Harbor, Inc. v. United States*, 27 F.3d 1545, 1551 (Fed.Cir.1994); *see also UNR Indus. v. United States*, 962 F.2d 1013, 1021 (Fed.Cir.1992), *aff'd sub nom. Keene Corp. v. United States*, 508 U.S. at 208–14, 113 S.Ct. at 2041–43. However, if the relief requested is different, 28 U.S.C. § 1500 is not implicated. *Loveladies Harbor, Inc. v. United States*, 27 F.3d at 1551.

Applying the concepts outlined in *UNR Industries v. United States, Keene Corp. v. United States* and *Loveladies Harbor, Inc. v. United States,* in order to determine if the section 1500 jurisdictional bar applies to the instant case, this court must examine whether or not a comparable claim against the United States was pending in another court at the time of filing in this court. The fact that count I of the district court action filed on November 4, 1988, was the only court still pending at the time the instant action was filed is not disputed by the parties. Defendant, in its motion to dismiss, notes that a "district court complaint filed in November, 1988, was still pending at the time this suit was filed on September 18, 1989." Plaintiffs, in their memorandum in opposition to defendant's motion to dismiss for lack of jurisdiction, also concede that "[a]s of September 12[sic], 1989, the filing date of this case, Plaintiffs' only pending claim against the United States was a request [count I] for declaratory relief. *Marks v. United States Army Corps of Engineers,* No. 88–10081–Civ–KING (S.D.Fla.)." Therefore, the existence of a pending case requesting declaratory relief against the "United States or any person ... at the time when the cause of action alleged in such suit or process arose....," pursuant to 28 U.S.C. § 1500, is not disputed by the parties in the suit pending in this court.

▄ Consequently, the court must address the subsidiary issue, whether the claim pending in the United States District Court for the Southern District of Florida, Case No. 88–10081–Civ–KING (S.D.Fla.), was "for or in respect to" the same claim as that pending before this court. In this court, the plaintiffs have filed a one count complaint. Count I of the complaint in the above-captioned case, in its entirety, reads:

### TEMPORARY TAKING AGAINST THE ARMY CORPS

Plaintiffs reallege paragraphs numbered 1 through 29 and further state:

30. At all times material, Defendant Army Corps improperly exercised jurisdiction over Plaintiffs' property.

31. Notwithstanding the fact that the Army Corps was acting outside of its jurisdiction, a cease and desist order was sent to Plaintiffs in January, 1973, preventing Plaintiffs from further developing the subject parcels and has continued a pattern of conduct to deny Plaintiffs their property rights.

32. The Army Corps' improper exercise of jurisdiction over the subject parcels constitutes a temporary taking since the imposition of the cease and desist order in January, 1973 and has continued to date.

33. As a direct and proximate result of the Army Corps' temporary taking of the parcels, Plaintiffs have been denied all economically feasible use and all reasonable beneficial use of their property in violation of the just compensation clause of the Fifth Amendment of the United States Constitution.

WHEREFORE, Plaintiffs demand judgment against the Defendant, The United States, for damages, costs and any other relief that this Court deems appropriate.

It also is important to note that count I of the complaint in this court is the same as count V in the pending district court action (No. 88–10081–Civ–KING (S.D.Fla.)), which was dismissed by that court on August 11, 1989, prior to the September 18, 1989 filing in this court.

By comparison, count I, the sole remaining count in the district court complaint (Case No. 88–10081–Civ–KING (S.D.Fla.)) at the time of plaintiffs' filing of the case in this court, was the claim for declaratory and injunctive relief, as follows:

### COUNT I

### COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

31. The allegations contained in paragraphs numbered 1 through 26 are realleged.

32. This is a claim for declaratory, injunctive and other relief to determine the legality and constitutionality of certain actions of the United States including asserting jurisdiction through the army corps over all of plaintiff's property within the

city limits of Key West, Florida under 33 U.S.C. §§ 403, 1311(a) and 1344, and thereby preventing use of said property.

33. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1346(a)(2).

34. Based in part on the principle of *res judicata*, the Corps of Engineers is required to abide by the regulations in effect during December of 1972 and January of 1973, and therefore should be enjoined from requiring permitting of the property on Parcel 34, above the compromise mean high water line.

35. The plaintiffs are not required to exhaust any existing federal or state administrative remedies since resort to such remedies would be futile. Defendant's agents and representatives have repeatedly stated that a dredge and fill permit will not be issued, and thus the plaintiffs are forced to seek judicial relief.

WHEREFORE, plaintiffs request that:

1. The Court declare the defendant without authority to require permitting for the property in question (Parcel 34) and enjoin any further interference in reference to the dredge and fill and paving and use of said property.

2. The Court grant plaintiffs any other relief as may be just and necessary.

3. Plaintiffs demand a jury trial on all issues triable as a matter of right by a jury and imposition of costs and attorneys' fees.

It is quite clear from the complaints filed in both courts that on September 18, 1989, the type of relief sought in the two complaints is distinguishable. The complaint filed in the United States Court of Federal Claims seeks money damages for an alleged taking in violation of the Fifth Amendment to the Constitution, in addition to costs and any other appropriate relief. Count I of the complaint pending in the district court at the time of the filing of the instant complaint, however, sought declaratory and injunctive relief, in addition to any other relief as may be just and necessary.[10] The catch all phrases, which request costs and any other appropriate relief or any other relief which may be just and necessary, do not change the nature of the two claims, one, a request for compensation due to an alleged improper taking under Amendment V to the Constitution, in this court and the other, a request for declaratory and injunctive relief, in the district court. Clearly, the two types of relief are different, thus diminishing the effect of a section 1500 claim. It is the opinion of this court, therefore, that 28 U.S.C. § 1500 does not act to divest this court of jurisdiction of the above-captioned cause of action. Defendant's motion to dismiss for lack of subject matter jurisdiction is, hereby, **DENIED.**

The court, therefore, proceeds to examine the merits of the parties' cross-motions for summary judgment. Plaintiffs allege that as a matter of law they have been subjected to a temporary regulatory taking under the Fifth Amendment. In support, plaintiffs argue that the actions of defendant rendered Parcels 34 and 38 virtually idle over a 10–year period, thus depriving the owners of all economically viable use of the property, for which they, allegedly, are entitled to just compensation.

Defendant has proposed multiple arguments in its motion for summary judgment as to why plaintiffs' claims for compensation based upon a Fifth Amendment taking must fail. Defendant asserts the following: (1) any allegation by the plaintiffs of a taking of Parcel 38 property below the mean high water line is noncompensable because it falls

10. The court notes that in the earlier related action brought in the United States District Court for the Southern District of Florida, Case No. 79–2323–Civ–SMA, the district court judge wrote:

That portion of the Motion to Dismiss addressed to the MARKS Defendants' [plaintiffs in the instant case] Counterclaim against the UNITED STATES seeking to have a 'Taking' or inverse condemnation declared and payment thereon is GRANTED without adjudication. The Court of Claims is the proper court to determine the issue of whether the denial of permits constitutes a 'Taking' of the property without just compensation and to determine any relief properly granted under the Tucker Act. 28 U.S.C. § 1491. The UNITED STATES as sovereign is immune from any suit except as it consents to be sued. *U.S. v. Testane* [sic], 424 U.S. 392, 399 [96 S.Ct. 948, 953, 47 L.Ed.2d 114] (1976). The mere fact that the 'Taking' claim is asserted in a Counterclaim does not alter the aforegoing.

within the government's navigational servitude; (2) defendant's articulation of a "mere assertion" of jurisdiction over the remaining portion of Parcel 38 by the Corps does not amount to a temporary taking under the Fifth Amendment; (3) no taking could have occurred because the State of Florida had refused to issue a water quality certificate, and, therefore, the denial of the permit by the Corps was "without prejudice" to plaintiffs; (4) plaintiff's claim of a taking of the portion of Parcel 38 above the mean high water line failed to ripen because plaintiffs failed to exhaust their administrative remedies; and (5) plaintiffs failed to comply with the applicable statutes of limitations, in effect, divesting this court of jurisdiction to adjudicate the taking claim. Also, with regard to Parcel 34, defendant argues that any claim regarding Parcel 34 must fail because such claims were not ripe at the time of filing.

Summary judgment in this court should be granted only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Rule 56 of this court is patterned on Rule 56 of the Federal Rules of Civil Procedure (Fed. R.Civ.P.) and is similar in language and effect. Both rules provide that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

Rule 56(c) of the Rules of the United States Court of Federal Claims (RCFC) provides that in order for a motion for summary judgment to be granted, the moving party bears the burden of demonstrating that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *Creppel v. United States*, 41 F.3d 627, 630–31 (Fed.Cir.1994); *Meyers v. Asics Corp.*, 974 F.2d 1304, 1306 (Fed.Cir.1992); *Rust Communications Group v. United States*, 20 Cl.Ct. 392, 394 (1990); *Lima Surgical Assocs., Inc. Volun-tary Employees' Beneficiary Ass'n Plan Trust v. United States*, 20 Cl.Ct. 674, 679 (1990), *aff'd*, 944 F.2d 885 (Fed.Cir.1991). Disputes over facts which are not outcome determinative under the governing law will not preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Summary judgment, however, will not be granted if "the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury [trier of fact] could return a verdict for the non moving party." *Id.; see also Uniq Computer Corp. v. United States*, 20 Cl.Ct. 222, 228–29 (1990).

When reaching a summary judgment determination, the judge's function is not to weigh the evidence, but to determine whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 249, 106 S.Ct. at 2510; *see, e.g., Cloutier v. United States*, 19 Cl.Ct. 326, 328 (1990), *aff'd without op.*, 937 F.2d 622 (Fed.Cir.1991). The judge must determine whether the evidence presents a disagreement sufficient to require submission to fact finding, or whether the issues presented are so one-sided that one party must prevail as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 250–52, 106 S.Ct. at 2511–12. When the record could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial, and the motion must be granted. *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Stated otherwise, if the nonmoving party cannot present the evidence to support its case under any scenario, then there should be no need for the parties to undertake the time and expense of a trial, and the moving party should prevail without further proceedings.

■ If, however, the nonmoving party produces sufficient evidence to raise a question as to the outcome of the case, then the motion for summary judgment should be denied. Any doubt over factual issues must be resolved in favor of the party opposing summary judgment, to whom the benefit of all presumptions and inferences runs. *Id.; see*

also *Litton Industrial Products, Inc. v. Solid State Systems Corp.*, 755 F.2d 158, 163 (Fed. Cir.1985); *H.F. Allen Orchards v. United States*, 749 F.2d 1571, 1574 (Fed.Cir.1984), *cert. denied*, 474 U.S. 818, 106 S.Ct. 64, 88 L.Ed.2d 52 (1985). Moreover, in the instant case, the court recognizes the "fact intensive" nature of Fifth Amendment taking cases which cautions "against precipitous grant of summary judgment." *Yuba Goldfields, Inc. v. United States*, 723 F.2d 884, 887 (Fed.Cir. 1983).

The initial burden on the party moving for summary judgment, to produce evidence showing the absence of a genuine issue of material fact, may be discharged if the moving party can demonstrate that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *see also Lima Surgical Assocs.*, 20 Cl.Ct. at 679. If the moving party makes such a showing, the burden then shifts to the nonmoving party to demonstrate that a genuine factual dispute exists by presenting evidence which establishes the existence of an element of its case upon which it bears the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. at 322, 106 S.Ct. at 2552; *Lima Surgical Assocs.*, 20 Cl.Ct. at 679.

Pursuant to Rule 56, the motion for summary judgment may succeed, whether or not accompanied by affidavits and/or other documentary evidence in addition to the pleadings already on file. *Celotex Corp. v. Catrett*, 477 U.S. at 324, 106 S.Ct. at 2553. Generally, however, in order to prevail, the nonmoving party will need to go beyond the pleadings, by use of evidence such as affidavits, depositions, answers to interrogatories and admissions, in order to demonstrate that a genuine issue for trial exists. *Id.*

▬ In the above-captioned case, the fact that both the parties argue in favor of summary judgment and allege an absence of genuine issues of material fact, however, does not relieve the court of its responsibility to determine the appropriateness of sum-

mary disposition in the particular case. *Prineville Sawmill Co. v. United States*, 859 F.2d 905, 911 (Fed.Cir.1988) (citing *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1391 (Fed.Cir.1987)). "[S]imply because both parties moved for summary judgment, it does not follow that summary judgment should be granted one or the other." *LewRon Television, Inc. v. D.H. Overmyer Leasing Co.*, 401 F.2d 689, 692 (4th Cir.1968), *cert. denied*, 393 U.S. 1083, 89 S.Ct. 866, 21 L.Ed.2d 776 (1969); *see also Levine v. Fairleigh Dickinson Univ.*, 646 F.2d 825, 833 (3d Cir.1981); *Home Ins. Co. v. Aetna Cas. & Sur. Co.*, 528 F.2d 1388, 1390 (2d Cir.1976); *Ishida v. United States*, 31 Fed.Cl. 280, 284 (1994). Cross-motions are no more than a claim by each party that it alone is entitled to summary judgment. The making of such inherently contradictory claims, however, does not establish that if one is rejected the other is necessarily justified. *Rains v. Cascade Indus., Inc.*, 402 F.2d 241, 245 (3d Cir. 1968); *Bataco Indus., Inc. v. United States*, 29 Fed.Cl. 318, 322 (1993), *aff'd* 31 F.3d 1176 (Fed.Cir.1994). The court must evaluate each party's motion on its own merit, taking care to draw all reasonable inferences against the party whose motion is under consideration. *Mingus Constructors, Inc.*, 812 F.2d at 1391. After an examination of the record in this case, the proposed contentions of fact submitted by both parties, and the factual findings of other courts in related litigation, submitted as part of the record, this court has determined that no genuine material facts exist and, therefore, this case is ripe for summary disposition.

For its first argument in favor of summary judgment, defendant asserts that any claim of a taking by the plaintiffs of Parcel 38 property below the mean high water line is noncompensable. Defendant contends that land within the navigational servitude is subject to the exclusive control of the United States and, therefore, not the proper subject of a taking claim.[11]

---

11. Parcel 38 is the same portion which was involved in the enforcement action filed in the United States District Court for the Southern District of Florida, Case No. 79–2323–Civ–SMA.

That enforcement action sought to have the property owners (plaintiffs in this case) remove fill material from navigable waters deposited below the mean high water line on Parcel 38.

■ The navigable waters of the United States have long been considered "public property" and have thus been under the exclusive control of the federal government pursuant to the Commerce Clause of the United States Constitution. U.S. Const. art. I, § 8, cl. 3; *United States v. Rands,* 389 U.S. 121, 122–23, 88 S.Ct. 265, 266–67, 19 L.Ed.2d 329 (1967); *Gilman v. Philadelphia,* 70 U.S. (3 Wall) 713, 724–25, 18 L.Ed. 96 (1866); *Gibbons v. Ogden,* 22 U.S. (9 Wheat.) 1, 6 L.Ed. 23 (1824); *Owen v. United States,* 851 F.2d 1404, 1408 (Fed.Cir.1988); *Confederated Tribes of Colville Reservation v. United States,* 20 Cl.Ct. 31, 40 (1990).

> This power to regulate confers upon the United States a 'dominant servitude,' (citation omitted) which extends to the entire stream and the stream bed below the ordinary high-water mark. The proper exercise of this power is not an invasion of any private property rights in the stream or the lands underlying it, for the damage sustained does not result from taking property from riparian owners within the meaning of the Fifth Amendment but from the lawful exercise of a power to which the interests of riparian owners have always been subject.

*United States v. Rands,* 389 U.S. at 123, 88 S.Ct. at 267; *Federal Power Com. v. Niagara Mohawk Power Corp.,* 347 U.S. 239, 249, 74 S.Ct. 487, 493, 98 L.Ed. 666 (1954); *Owen v. United States,* 851 F.2d at 1408; *Coastal Petroleum Co. v. United States,* 207 Ct.Cl. 701, 707–708, 524 F.2d 1206, 1210 (1975), *cert. denied,* 456 U.S. 915, 102 S.Ct. 1770, 72 L.Ed.2d 174 (1982); *Weatherford v. United States,* 606 F.2d 851, 852 (9th Cir.1979). Indeed, it is well settled in the United States Court of Appeals for the Federal Circuit that, in light of the dominant interest in preserving the public right of navigation, the authority of the United States over navigable waters is "supreme." *Confederated Tribes of Colville Reservation v. United States,* 964 F.2d 1102, 1108 (Fed.Cir.1992) (citing *Gordon v. United States,* 211 Ct.Cl. 310, 311, 546 F.2d 430 (1976), *cert. denied,* 430 U.S. 930, 97 S.Ct. 1549, 51 L.Ed.2d 774 (1977)); *Goose Creek Hunting Club, Inc. v. United States,* 207 Ct.Cl. 323, 331, 518 F.2d 579, 583 (1975); *Sherrill v. United States,* 180 Ct.Cl. 914, 917,

381 F.2d 744, 745–46 (1967); *Marret v. United States,* 82 Ct.Cl. 1, 12, 1935 WL 2216 (1935), *cert. denied,* 299 U.S. 545, 57 S.Ct. 8, 81 L.Ed. 401 (1936). Furthermore, "the determination of the necessity for a given improvement of navigable capacity, and the character and extent of it, is for Congress alone." *United States v. Chicago, M., S.P. & P.R.R.,* 312 U.S. 592, 596, 61 S.Ct. 772, 775, 85 L.Ed. 1064 (1941); *Owen v. United States,* 851 F.2d at 1408. Thus, upon the determination of Congress to improve or preserve navigation, the navigational servitude defines the appropriate boundaries within which the United States can assert its power to supersede private ownership interest without creating an obligation to pay just compensation under the eminent domain clause of the Fifth Amendment. *Owen v. United States,* 851 F.2d at 1408.

■ Therefore, that portion of plaintiffs' claim before this court, arising from filling areas of Parcel 38 below the mean high water line, which is located within the navigational servitude, and which was the subject of the 1973 cease and desist order issued pursuant to section 10 of the River and Harbor Act of 1899, 33 U.S.C. § 403, creates no obligation on the part of the government to compensate plaintiffs pursuant to the taking provision of the Fifth Amendment to the United States Constitution. That portion of defendant's motion for summary judgment which argues that there can be no taking of the area of Parcel 38 below the mean high water line, within navigational servitude, is, therefore, **GRANTED.**

The court next addresses defendant's second through fifth arguments on summary judgment, all of which address whether plaintiffs can establish a taking of that portion of Parcel 38 determined to be above the mean high water line and/or of Parcel 34. For its second argument, defendant alleges that its actions in the above-captioned case amount to a "mere assertion" of jurisdiction, which cannot constitute a Fifth Amendment taking unless a permit had been sought and denied. *See Williamson County Regional Planning Com. v. Hamilton Bank of Johnson City,* 473 U.S. 172, 186–90, 105 S.Ct. 3108, 3116–18, 87 L.Ed.2d 126 (1985); *Co-*

*nant v. United States,* 12 Cl.Ct. 689, 691 (1987). Defendant further argues that: "Mere issuance of a cease and desist order or assertion of the Corps' regulatory jurisdiction does not constitute a taking." In support, defendant cites to *United States v. Riverside Bayview Homes, Inc.,* 474 U.S. 121, 106 S.Ct. 455, 88 L.Ed.2d 419 (1985) and *Hodel v. Virginia Surface Mining & Reclamation Ass'n,* 452 U.S. 264, 101 S.Ct. 2352, 69 L.Ed.2d 1 (1981).

■ First, defendant's theory that a Fifth Amendment taking does not occur unless a permit has been sought and denied would not even apply to the areas of Parcels 38 and 34 found to be above the mean high water line because they are outside the jurisdiction of the United States and, therefore, are not subject to the requirement that a permit must be sought. Moreover, the portion of Parcel 38 below the mean high water line has been disposed of above, as being within the navigational servitude of the United States.

■ Second, the extensive record before this court indicates that defendant's conduct in this case amounts to much more than a "mere assertion" of jurisdiction. The record reflects substantial and repeated activity by the Corps, dating back to the cease and desist order in 1973, which prohibited plaintiff from the filling, not only areas of Parcel 38 ultimately determined by the courts to be below the mean high water line and subject to United States exclusive jurisdiction, but also areas ultimately determined to be above the mean high water line in both Parcels 34 and 38. The criminal information, Case No. 73–509–Cr–WM, brought against the plaintiffs in the United States District Court for the Southern District of Florida and the ensuing enforcement actions in which the Corps sought to compel removal of the fill and restoration of Parcels 34 and 38 both above and below the mean high water line, reflects much more than a "mere assertion" of jurisdiction. Indeed it was not until 1984, approximately eleven years after the initial cease and desist order was issued by the government, when the United States Court of Appeals for the Eleventh Circuit affirmed the opinion of the district court judge, that

the mean high water line was defined with finality, *United States v. Marks Dev., Inc.,* No. 79–2323–Civ–SMA (S.D.Fla. Jan. 15, 1982), *aff'd sub nom. United States v. Context–Marks Corp.,* 729 F.2d 1294 (11th Cir. 1984). However, although defendant's activity clearly amounts to more than a "mere assertion" of jurisdiction over the property, such a determination does not necessarily mean that an unconstitutional taking has occurred under the facts and circumstances of the case.

■ Third, defendant contends that because the State of Florida refused to issue a water quality certificate to the plaintiffs after reviewing the merits of the application, the subsequent denial of the permit by the Corps, based on the State's denial, was "without prejudice," thus giving rise to no taking claim against the defendant. In support of this contention, defendant asserts that section 401 of the Federal Water Pollution Control Act ("The Clean Water Act"), 33 U.S.C. § 1341(a)(1), provides that "[n]o license or permit shall be granted if certification has been denied by the State. . . ." Defendant, however, fails to mention in its pleadings that, in the "Findings of Fact" made in the memorandum opinion issued by Judge Aronovitz, the court found that at the time the State of Florida did not require certification for a project, such as the one projected for Parcel 38:

> 32. According to John Adams, the Army Corps of Engineers has never considered Island in the Sun's dredge and fill permits on its merits. The Corps' denial of Island in the Sun's previous application was based on the State of Florida's denial of a water quality certification. At the time of the fill placement Florida possessed a water quality certification program but the state did not require certification for a project such as the one instituted on Parcel 38.

Although § 1341 of the Clean Water Act makes reference to state law, the defendant should not be allowed to rely on an argument that if there is no state permit requirement, federal law precludes the review of the permitting process. Like Judge Aronovitz in the district court, this court rejects defendant's reasoning and finds that given the

facts of the above-captioned case, the denial of a permit by the Corps should not be dismissed summarily, but should be subject to judicial review.

■ Fourth, defendant claims that any taking claimed by plaintiffs regarding the portion of Parcel 38 above the mean high water line failed to ripen because plaintiffs failed to exhaust their administrative remedies by seeking a permit for the filling of the portion of Parcel 38 above the mean high water line. This court notes that the issue of ripeness was unambiguously decided in the opinion of United States District Court for the Southern District of Florida on defendant's motion to dismiss in Case No. 79–2323–Civ–SMA, as follows:

Plaintiff raises an issue with regard to exhaustion of administrative remedies by the MARKS Defendants for issuance of prospective permits for development of the land which may not necessarily include dredging and/or filling for purposes such as a boat basin, or for permit requests for future dredging and filling or development in other areas of Parcel 38. This argument normally would have considerable persuasion with the Court as to why the Motion to Dismiss should be granted as to any prospective requested uses or permits not heretofore submitted and not involved in the original Agency action. However, Defendants argue, and at oral argument counsel for Plaintiff acknowledged, that no future permit would be issued for any portion of Parcel 38 unless or until the original dredge and fill had been restored as requested in the complaint. Under such circumstances Defendants argue that to require them to exhaust administrative remedies would be a futile act. The Court agrees.

■ In general, a plaintiff is not entitled to seek judicial review before following the prescribed administrative remedies. *Hodel v. Virginia Surface Mining & Reclamation Ass'n,* 452 U.S. at 297, 101 S.Ct. at 2371; *Burlington N.R.R. v. United States,* 752 F.2d 627, 630 (Fed.Cir.1985); *Conant v. United States,* 12 Cl.Ct. at 692. Evidence of the futility of such exhaustion, however, cures any resulting defect in the ripeness of the

controversy, thus allowing this court to exert its jurisdiction. *Bendure v. United States,* 213 Ct.Cl. 633, 641, 554 F.2d 427, 431 (1977); *Cienega Gardens v. United States,* 33 Fed.Cl. 196, 207 (1995); *see also Formanek v. United States,* 18 Cl.Ct. 785, 790–93 (1989); *Beure–Co. v. United States,* 16 Cl.Ct. 42, 51–52 (1988); *Loveladies Harbor, Inc. v. United States,* 15 Cl.Ct. 381, 385–87 (1988); *Parkview Corp. v. Department of Army, Corps of Engineers,* 490 F.Supp. 1278, 1282 (E.D.Wis. 1980). Evidence of such futility is clearly evident in the record with respect to Parcels 34 and 38 in the instant case, and is memorialized in the opinion of the United States District Court for the Southern District of Florida in Case No. 79–2323–Civ–SMA. Like the district court, this court finds that defendant should not be allowed to reargue the exhaustion theory.

■ Fifth, defendant asserts, as an affirmative defense, that the statute of limitations has run as to the only taking claim which was arguably ripe for review, the denial of the permit to fill below the mean high water line. Although defendant is correct in pointing out that the Tucker Act waives sovereign immunity for suits in the Court of Federal Claims "filed within six years after such claim first accrues," 28 U.S.C. § 2501 (1988), defendant is incorrect in its determination of the date from which the statutory six year period should be calculated.

Defendant cites authority to the effect that the statute of limitations begins to run on the date of denial of a permit. *See United States v. Riverside Bayview Homes,* 474 U.S. 121, 106 S.Ct. 455, 88 L.Ed.2d 419; *Conant v. United States,* 12 Cl.Ct. 689; *United States v. Byrd,* 609 F.2d 1204 (7th Cir.1979). This precedent, however, is inapplicable to the instant case. The instant case alleges a temporary taking, the duration of which was unknown until issuance of the decision of the United States Court of Appeals for the Eleventh Circuit in 1984. *United States v. Context–Marks Corp.,* 729 F.2d 1294 (11th Cir. 1984). It would be unfair to start the running of the statute of limitations from a date prior to final resolution by the courts of plaintiffs' interest in the property at issue. This issue was addressed by the Court of

Claims in *Oro Fino Consol. Mines, Inc. v. United States*, 118 Ct.Cl. 18, 92 F.Supp. 1016 (1950):

> Under the circumstances, it would be unfair if the statute had started running against plaintiff at a time when there was no way of knowing the duration of the interest taken. While not exactly like the case at bar, the [*United States v.*] *Dickinson* [331 U.S. 745, 67 S.Ct. 1382, 91 L.Ed. 1789 (1947)] case is pertinent because it recognized that the statute of limitations in taking cases does not necessarily begin to run at the first moment that the plaintiff could have brought suit. It was held in the *Dickinson* case that an aggrieved owner need not bring suit until the consequences of the taking "have so manifested themselves that a final account may be struck."

118 Ct.Cl. at 22, 92 F.Supp. at 1018. In the case at bar, the consequences, particularly the duration of the alleged taking, "manifested themselves" in 1984, when the Eleventh Circuit issued its opinion. *United States v. Context–Marks Corp.*, 729 F.2d 1294 (11th Cir.1984). The court, therefore, rejects defendant's affirmative defense with respect to the statute of limitations.

▉ Next, the court must address the merits of the temporary regulatory taking claim raised by plaintiffs. It is well settled in law that the taking of private property for public use must result in the payment of compensation under the Fifth Amendment to the United States Constitution. The Fifth Amendment provides: "nor shall private property be taken for public use without just compensation." U.S. Const. amend. V. The purpose of this constitutional guarantee is to prevent the "[g]overnment from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States*, 364 U.S. 40, 49, 80 S.Ct. 1563, 1569, 4 L.Ed.2d 1554 (1960). The question raised by the plaintiffs is whether they have been subjected to a temporary regulatory taking by government action and, therefore, whether they are entitled to compensation by the government. The ultimate determination of when "fairness and justice" require compensation, however, must be made based on the particular circumstances of each case. *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, ——, 112 S.Ct. 2886, 2922, 120 L.Ed.2d 798, 812 (1992); *Connolly v. Pension Ben. Guaranty Corp.*, 475 U.S. 211, 224, 106 S.Ct. 1018, 1025, 89 L.Ed.2d 166 (1986); *Penn Central Transportation Co. v. New York City*, 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978); *United States v. Central Eureka Mining Co.*, 357 U.S. 155, 168, 78 S.Ct. 1097, 1104, 2 L.Ed.2d 1228 (1958); *Langenegger v. United States*, 756 F.2d 1565, 1570 (Fed.Cir.), *cert. denied*, 474 U.S. 824, 106 S.Ct. 78, 88 L.Ed.2d 64 (1985); *Skip Kirchdorfer, Inc. v. United States*, 26 Cl.Ct. 666, 672–73 (1992).

▉ "Property is taken in the constitutional sense when inroads are made upon an owner's use of it to an extent that, as between private parties, a servitude has been acquired either by agreement or in course of time." *United States v. Dickinson*, 331 U.S. 745, 748, 67 S.Ct. 1382, 1384, 91 L.Ed. 1789 (1947). In determining whether there has been a taking, it is not essential for the government to have taken property for its own use. *Hawaii Housing Authority v. Midkiff*, 467 U.S. 229, 244, 104 S.Ct. 2321, 2331, 81 L.Ed.2d 186 (1984); *Langenegger v. United States*, 756 F.2d at 1570. A taking can occur whether or not the government takes physical possession of the property, and also can occur simply when the government by its actions deprives the owner of all or most of its interest in the property. *Aris Gloves, Inc. v. United States*, 190 Ct.Cl. 367, 374, 420 F.2d 1386, 1391 (1970). Thus, the United States may be held responsible for a taking even when its action is not the final direct cause of the property loss or damage. *Langenegger*, 756 F.2d at 1570.

Moreover, courts have recognized that just compensation is required for a "temporary" taking under the Fifth Amendment. *First English Evangelical Lutheran Church v. County of Los Angeles*, 482 U.S. 304, 107 S.Ct. 2378, 96 L.Ed.2d 250 (1987). The court in *First Lutheran Church* stated that " 'temporary' takings which ... deny a landowner all use of his property, are not different in kind from permanent takings, for which the

Constitution clearly requires compensation." *Id.* at 318, 107 S.Ct. at 2388. The Court in *First Lutheran Church* summarized the Constitutional right to compensation for a temporary taking as follows:

> Consideration of the compensation question must begin with direct reference to the language of the Fifth Amendment, which provides in relevant part "private property [shall not] be taken for public use, without just compensation." As its language indicates, and as the Court has frequently noted, this provision does not prohibit the taking of private property, but instead places a condition on the exercise of that power. *See Williamson County,* 473 U.S., at 194 [105 S.Ct. at 3120]; *Hodel v. Virginia Surface Mining & Reclamation Ass'n, Inc.,* 452 U.S. 264, 297, n. 40 [101 S.Ct. 2352, 2371, n. 40, 69 L.Ed.2d 1] (1981); *Hurley v. Kincaid,* 285 U.S. 95, 104 [52 S.Ct. 267, 269, 76 L.Ed. 637] (1932); *Monongahela Navigation Co. v. United States,* 148 U.S. 312, 336 [13 S.Ct. 622, 630, 37 L.Ed. 463] (1893); *United States v. Jones,* 109 U.S. 513, 518 [3 S.Ct. 346, 349, 27 L.Ed. 1015] (1883). This basic understanding of the Amendment makes clear that it is designed not to limit the governmental interference with property rights *per se,* but rather to secure *compensation* in the event of otherwise proper interference amounting to a taking. Thus, government action that works a taking of property rights necessarily implicates the "constitutional obligation to pay just compensation." *Armstrong v. United States,* 364 U.S. 40, 49 [80 S.Ct. 1563, 1569, 4 L.Ed.2d 1554] (1960).

*First Lutheran Church,* 482 U.S. at 314–15, 107 S.Ct. at 2385–86.

■ In determining whether a temporary regulatory taking has occurred, this court should examine three factors, repeatedly set forth by the United States Supreme Court and the United States Court of Appeals for the Federal Circuit: (1) the character of the governmental action; (2) the economic impact of the regulation on the claimant, and; (3) the extent to which the regulation has interfered with reasonable investment backed expectations. *Keystone Bituminous*

*Coal Ass'n v. DeBenedictis,* 480 U.S. 470, 495, 107 S.Ct. 1232, 1247, 94 L.Ed.2d 472 (1987); *Kaiser Aetna v. United States,* 444 U.S. 164, 175, 100 S.Ct. 383, 390, 62 L.Ed.2d 332 (1979); *Connolly v. Pension Ben. Guaranty Corp.,* 475 U.S. at 224–25, 106 S.Ct. at 1025; *Creppel v. United States,* 41 F.3d 627, 631 (Fed.Cir.1994); *Florida Rock Indus., Inc. v. United States,* 791 F.2d 893, 901 (Fed.Cir.1986), *cert. denied,* 479 U.S. 1053, 107 S.Ct. 926, 93 L.Ed.2d 978 (1987); *Loveladies Harbor, Inc. v. United States,* 15 Cl.Ct. at 391. Otherwise stated, the Court in *Penn Central Transportation Co. v. New York City,* 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978), wrote:

> In engaging in these essentially ad hoc, factual inquiries, the Court's decisions have identified several factors that have particular significance. The economic impact of the regulation on the claimant and, particularly, the extent to which the regulation has interfered with distinct investment-backed expectations are, of course, relevant considerations. [citation omitted]. So, too, is the character of the governmental action. A "taking" may more readily be found when the interference with property can be characterized as a physical invasion by government, see, [sic] *e.g., United States v. Causby,* 328 U.S. 256 [66 S.Ct. 1062, 90 L.Ed. 1206] (1946), than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good.

*Id.*

Regarding the first factor, the character of the government action, the Supreme Court summarized the current judicial approach and its origin, as follows:

> 'Harmful or noxious use' analysis was, in other words, simply the progenitor of our more contemporary statements that "land-use regulation does not effect a taking if it 'substantially advance[s] legitimate state interests'...." [Citations omitted.]

*Lucas v. South Carolina Coastal Council,* 505 U.S. 1003, 1023–24, 112 S.Ct. 2886, 2897, 120 L.Ed.2d 798, 818 (1992). Subsequently, the United States Court of Appeals for the Federal Circuit wrote: "Courts must inquire

into the degree of harm created by the claimant's prohibited activity, its social value and location, and the ease with which any harm stemming from it could be prevented." *Creppel v. United States*, 41 F.3d at 631.

■ Under the second enunciated factor, the economic impact of the regulation, plaintiffs bear the burden of demonstrating that the governmental actions denied the plaintiff of all "economically viable use of his land." *Nollan v. California Coastal Com.*, 483 U.S. 825, 834, 107 S.Ct. 3141, 3147, 97 L.Ed.2d 677 (1987); *Agins v. Tiburon*, 447 U.S. 255, 260, 100 S.Ct. 2138, 2141, 65 L.Ed.2d 106 (1980). In the *Lucas* case, the court stated this principle as follows:

> We think, in short, that there are good reasons for our frequently expressed belief that when the owner of real property has been called upon to sacrifice *all* economically beneficial uses in the name of the common good, that is, to leave his property economically idle, he has suffered a taking.

*Lucas v. South Carolina Coastal Council*, 505 U.S. at 1019, 112 S.Ct. at 2895, 120 L.Ed.2d at 815 (footnote omitted).

■ Finally, the third articulated factor, the extent to which the regulation has interfered with reasonable investment backed expectations, "limits recovery to owners who can demonstrate that they bought their property in reliance on the non-existence of the challenged regulation. One who buys with knowledge of a restraint assumes the risk of economic loss." *Creppel v. United States*, 41 F.3d at 632. According to the Supreme Court, "[a]s we have said on numerous occasions, the Fifth Amendment is violated when land use regulation 'does not substantially advance legitimate state interests *or denies an owner economically viable use of his land.*'" *Lucas v. South Carolina Coastal Council*, 505 U.S. at 1016, 112 S.Ct. at 2893, 120 L.Ed.2d at 813 (citing *Agins v. Tiburon*, 447 U.S. 255, 100 S.Ct. 2138, 65 L.Ed.2d 106).

■ In the present case, plaintiffs have claimed a temporary taking as a matter of law, alleging that the government actions in this case rendered their property virtually worthless for over ten years, thus depriving the owners of all economically viable use of the property during that period. Plaintiffs contend that "[t]he Property, situated on Florida wetlands, could not be developed or otherwise built upon until it was dredged and filled," and that defendant's refusal to grant the necessary permit stripped plaintiffs of all use of the land. On the other hand, defendant contends that "[i]f there has been an interference with plaintiffs' ability to use or develop their wetlands property, compensation must be denied so long as there are valuable economic rights remaining in the property as a whole."

■ First, when examining the character of the government action in the above-captioned case, this court acknowledges that the cease and desist order, as well as the permit requirements imposed by the government, did impact on the plaintiffs' stated intention to construct a multi-unit apartment complex and marina on Parcels 38 and 34. However, the regulatory permit requirements and the issuance by the government of the cease and desist order do not, *per se*, amount to a regulatory taking, unless the regulatory action goes "too far." *Tabb Lakes, Ltd. v. United States*, 10 F.3d 796, 800 (Fed.Cir. 1993). "[W]hile property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking." *767 Third Ave. Assoc. v. United States*, 48 F.3d 1575, 1580 (Fed.Cir.1995) (citing *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 (1922)). As stated by the Supreme Court in *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 126–27, 106 S.Ct. 455, 458–59, 88 L.Ed.2d 419 (1985):

> Moreover, we have made it quite clear that the mere assertion of regulatory jurisdiction by a governmental body does not constitute a regulatory taking.... A requirement that a person obtain a permit before engaging in a certain use of his or her property does not itself "take" the property in any sense: after all, the very existence of a permit system implies that permission may be granted, leaving the landowner free to use the property as desired. Moreover, even if the permit is denied, there may be other viable uses available to the owner. Only when a permit is denied and the effect of the denial is to prevent

"economically viable" use of the land in question can it be said that a taking has occurred.

Plaintiffs rely heavily on portions of Judge Aronovitz' memorandum opinion in the district court case (Case No. 79–2323–Civ–SMA) to establish their version of the character of the government action as a denial of plaintiffs complete use of their property. To be sure, Judge Aronovitz wrote:

In light of the Corps' inability to dispositively determine the location of the mean high water line in January of 1973, the developers of the project were unable to proceed with the project for fear that additional impermissible filling would take place.

And, he further stated:

The government has argued that the [plaintiffs] ... were free in January, 1973 to continue development above the mean high water line since the cease and desist order only addressed land below the mean high water line demarcation. Unfortunately, however, the government was unable to inform [Plaintiffs] ... where that elusive line might be, so the government was inviting [plaintiffs] ... to risk the possibility of continuing to be in violation of the law. This Court does not believe that this course of action was a feasible alternative or that any reasonably prudent businessman would gamble on the loss of additional time, labor and money.

Judge Aronovitz, however, concluded that:

Accordingly, this Court orders that the United States of America and the State of Florida are enjoined from requiring prospective permitting of the property on Parcel 38, south of the compromise mean high water line. The [plaintiffs] ... shall be free to fill and develop the property subject to compliance with all applicable City of Key West requirements and all applicable rules and regulations setting the placement, location, height, density and method or manner of fill; conditioned further, that the Marks [plaintiffs] ... and/or Island in the Sun and/or their successors/assigns cause partial restoration of the area below the compromise mean high water line as ordered herein.

Plaintiffs fail to realize that although Judge Aronovitz found that the government actions might have acted as a hindrance to plaintiffs' intended use of the property, he also concluded, with certain conditions, that plaintiffs are "free to fill and develop the property subject to compliance with all applicable rules and regulations setting the placement, location, height, density and method or manner of fill...." Moreover, in his opinion, Judge Aronovitz did not reach or address whether or not the cease and desist order or the permit requirements amounted to a taking. In sum, plaintiffs' reliance on the findings of Judge Aronovitz is misplaced. The district court findings do not support plaintiffs' claim that the character of the government action denied plaintiffs all economically beneficial uses of Parcels 34 and 38.

■ Further, in order to assert a Fifth Amendment taking claim pursuant to the Tucker Act, 28 U.S.C. § 1491, a "claimant must concede the validity of the government action which is the basis of the taking claim to bring suit under the Tucker Act, 28 U.S.C. § 1491." *Tabb Lakes, Ltd. v. United States,* 10 F.3d at 802, *see. also Florida Rock Indus., Inc. v. United States,* 791 F.2d 893, 899 (Fed.Cir.1986), *cert. denied,* 479 U.S. 1053, 107 S.Ct. 926, 93 L.Ed.2d 978 (1987). In other words, to assert a taking claim, the government must have had the authority to regulate the proposed activity. The rationale is that:

[A] Tucker Act suit does not lie for an executive taking not authorized by Congress, expressly or by implication. *NBH Land Co. v. United States,* 576 F.2d 317, 319, 217 Ct.Cl. 41 (1978); *see Southern Cal. Fin. Corp. v. United States,* 634 F.2d 521, 523, 225 Ct.Cl. 104 (1980), *cert. denied,* 451 U.S. 937, 101 S.Ct. 2016, 68 L.Ed.2d 324 (1981) ("[B]efore a compensable taking can be found by the court, there must be some congressional authorization, express or implied, for the particular taking claimed.").

*Tabb Lakes, Ltd. v. United States,* 10 F.3d at 802.

In the instant case, the government actions relating to that portion of Parcel 38 above

the mean high water line were found by the district court to have been unauthorized. Judge Aronovitz found that the issuance of the cease and desist order by the Corps directed to activity on Parcel 38 as a whole, without first having defined the mean high water line, had the effect of exercising jurisdiction over portions of the land above the mean high water line which were not within the control of the United States government. As stated by Judge Aronovitz, "the government failed to produce the requisite scientific evidence or data needed to indicate that it could exactly locate the mean high water line for December of 1972." Furthermore, Judge Aronovitz stated: "Had the Corps not intervened in January 1973, without locating the mean high water line the land above the mean high water line could have been developed, and once done, it would have been grandfathered and exempt from the Corps' revised wetlands policy." After adopting the compromise mean high water line adopted by the parties, the judge found that the government did not have the authority to assert jurisdiction over that portion of the land above the mean high water line and enjoined both the United States and the State of Florida from imposing any permit requirements on Parcel 38 above the mean high water line.

Consequently, the instant plaintiffs are in no position to concede the validity of the government actions in order to maintain a Tucker Act taking claim. Although the error by the Corps in asserting its jurisdiction over the portion of Parcel 38 above the mean high water line possibly might have given rise to due process claim, it does not satisfy the necessary elements to give rise to a taking claim. *Tabb Lakes, Ltd. v. United States,* 10 F.3d at 803.

There also is sufficient evidence in the instant case to demonstrate that there was a legitimate state interest in preserving the quality of water within the area of plaintiffs' land. Judge Aronovitz described the property as follows: "Parcel 38 contains some wetlands which do perform environmental functions. There are mangroves, turtlegrass and salicornia thereon which produce an organic food source known as detritus. These wet-

lands can serve as a habitat for aquatic organisms and the birds which feed on them." Moreover, the government stated that: "the project as proposed will have definite long-term adverse effects on the water quality of the Class III waters of the immediate waterway area, Cow Key Channel and will be contrary to policy of the Board of the Department of Pollution Control." Therefore, the evidence presented demonstrates that the land at issue serves an important function to the immediate environment and the proposed activity could adversely affect that property. Such evidence is conclusive of a legitimate state interest.

Plaintiffs also have not met their burden under the second test for establishing a taking claim, that the governmental actions left the plaintiffs' land devoid of all economic viability. Plaintiffs conceded in their responses to defendant's first set of interrogatories that "[w]ith the exception of the second fill project which commenced in June, 1986, no attempt has been made to develop any part of Parcels 34 and 38." Moreover, Lawrence Marks admitted that in addition to the ongoing litigation, plaintiffs did not fill the property above the mean high water line after 1973, before the date of the new wetlands regulations, because he did not have the money, and there was no money to proceed to development because of a recession from 1973 to 1976. Further, it is undisputed that as of September 18, 1989, plaintiffs sold the majority of Parcel 38 for millions of dollars. The consideration received from this sale alone demonstrates the remaining economic viability of the property. Therefore, plaintiffs have failed to demonstrate the type of economic impact resulting from the regulation and the government actions, necessary to demonstrate that the land was void of all economic viability to the extent that a court could find an unconstitutional taking.

Finally, plaintiffs have failed to demonstrate that regulatory and government actions interfered with the reasonable investment backed expectations of the plaintiffs. As discussed above, this factor "limits recovery to owners who can demonstrate that they bought their property in reliance on the nonexistence of the challenged regulation."

*Creppel v. United States,* 41 F.3d at 632. It is not sufficient to suggest that, although a regulation existed, which plaintiffs should have or did know about, the government authorities had not been in the practice of enforcing the regulation. Moreover, the record, as discussed immediately above, demonstrates that plaintiffs still profited from their investment as a result of the sale of the property. Certainly, the taking clause in the Constitution should not be construed to provide reimbursement to investors for unrealized expectations, or for poor investment decisions.

In sum, even giving plaintiffs the benefit of every reasonable doubt, plaintiffs in this case have failed on summary judgment to meet their burden of proof to present facts, beyond the allegations in the complaint, sufficient to prevail on any of the three factors necessary to demonstrate a valid Fifth Amendment temporary regulatory taking claim, or to demonstrate that a genuine issue of material fact exists, sufficient to defeat defendant's motion for summary judgment. In the instant case, the facts have been flushed out in numerous federal courts and in administrative bodies. This court believes that if sufficient facts had been available to bolster plaintiffs' case, they would have been presented to this court.

■ The character of the government action, while perhaps a hindrance to plaintiffs' preferred, intended use of the land, did not reach the level of an unconstitutional taking. Moreover, while the government actions may have had an economic impact, temporary or otherwise, on the plaintiffs' planned investment in the land at issue, and the land ultimately may not have been used for plaintiffs' intended purposes, that impact did not leave plaintiffs' land devoid of all economically viable use. In fact, in his October 23, 1986 opinion, Judge Aronovitz of the district court appears to have anticipated future development of the land at issue. Judge Aronovitz set conditions for future development of the land, including that the plaintiffs should not be required to apply for retroactive permits, which suggests that he believed that future development of Parcels 34 and 38 remained a viable option. The defendant also has dem-onstrated that the government actions were undertaken with a legitimate state interest in mind. Moreover, regarding those portions of plaintiffs' land above the mean high water line, a compensable taking claim cannot lie based on actions undertaken by government officials without authority.

### CONCLUSION

After an exhaustive review of the record in the instant case, the court **DENIES** defendant's motion to dismiss and **GRANTS** defendant's motion for summary judgment. Plaintiff's cross-motion for summary judgment is accordingly **DENIED**. The clerk of the court is, therefore, **ORDERED** to enter judgment in favor of the defendant.

**IT IS SO ORDERED.**